GOODWIN et al., Appellants,

v.

KARLSHAMNS USA, INC., d.b.a. Capital City Products Company, Appellee.

[Cite as *Goodwin v. Karlshamns USA, Inc.* (1993), 85 Ohio App.3d 240.]

Court of Appeals of Ohio,
Franklin County.

No. 92AP–1122.

Decided Jan. 28, 1993.

*Barkan & Neff* and *Sanford A. Meizlish,* for appellants.

*William W. Johnston,* for appellee.

TYACK, Judge.

On December 8, 1989, Kelvin L. Goodwin was seriously injured as a result of an explosion at Capital City Products Company ("Capital City"). Goodwin and his wife later filed a lawsuit in which they claimed that the injuries were caused by the intentional tort of Capital City, which had been Mr. Goodwin's employer on that date. Karlshamns USA, Inc., d.b.a. Capital City, defended against the lawsuit and eventually filed a motion for summary judgment, which was sustained. The Goodwins (hereinafter "appellants") have appealed, assigning a single error for our consideration:

"The lower court erred in failing to find that reasonable minds could differ concerning whether an intentional tort had been committed by the employer against its employee."

Civ.R. 56(C) provides the standard for evaluating whether or not summary judgment is appropriate, when it states, in pertinent part:

"Summary judgment shall be rendered forthwith if the pleading[s], depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor."

The issue before the trial court was whether, so construing the evidence before the court, appellants had demonstrated that reasonable minds could find an intentional tort to have been committed by Capital City.

The legal guidelines for assessing whether an intentional tort has been committed were recently set forth in the first two paragraphs of the syllabus to *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, as follows:

"1. Within the purview of Section 8(A) of the Restatement of the Law 2d, Torts, and Section 8 of Prosser & Keeton on Torts (5 Ed.1984), in order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to

such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. (*Van Fossen v. Babcock & Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, modified as set forth above and explained.)

"2. To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent. * * * "

Digesting the legal principles set forth above and applying them to the present case, the issue becomes whether or not the evidence before the trial court, construed most strongly in favor of appellants, demonstrated that an explosion at Capital City was a substantial certainty.

The evidence before the trial court was as set forth below.

Stanley Sourelis, the director of engineering for Karlshamns, USA, Inc., on the December 8, 1989 date, provided an affidavit in which he was very critical of the system in use at the plant. His affidavit includes the following:

"When I came to this company the equipment and plant itself was old, outdated and very archaic. We had always, in the back of our minds, waited expectantly for the money to build a new plant. So in the meantime, we had to keep the ship afloat, so to speak. I recall in 1973 when I came here the plant was pretty much a lost cause, but they insisted on keeping it alive. We re-electrified everything to code, nothing here had been up to code, tried to de-bottleneck and spend our money as wisely as possible to upgrade the plant so it was productive and safe. The company was then owned by Stokely VanCamp and subsequently sold to Quaker Oats. Then this division, Capitol [*sic*] City Products, spun off and was sold in a leverage[d] buy out. It was purchased by a Swedish firm, Karlshamns, who owns it now.

"At the time of the explosion on December 8, 1989, maintenance people, to the best of my knowledge, took a roof vent, because it was emitting some oil vapor, and contained it in a pot-like arrangement with a four inch opening on top and a

[C]hinese-like hat on it. The material which would come out of converters when they were relieved would be a mist which would condense and fill up the pot. They got tired of going up there and emptying the pot with pails, so they connected a drain line to storage tank # 95. You *cannot* do that because these converters are venting hydrogen gas and the last thing in the world you want to do is communicate gas, in any way, even remotely, with any area which may contain it. You don't even want hydrogen gas contained intermediately, as in that little pot on the roof. That pot should have been water purged. We are rebuilding this plant here which you can examine to see what is required by code. This pot-venting system was homemade, somebody decided it was a good way to save themselves the trouble of doing the venting system right. There are twenty-six maintenance people and you may be hard pressed to find out exactly who did the homemade venting job.

"On the particular day of the explosion, December 8, 1989, they were hydrogenating soybean oil to a material called stearin in converter # 319, which was vented to the pot on the roof. Stearin has a very high melting point and when it cools, it turns into a substance similar to candle wax. Stearin was in liquid form in converter # 319 and so was misted with the hydrogen gas which was being vented through the relief valve. Naturally, it condensed, and at the cooler temperature in the vent pot it turned into a waxy substance, which is hard enough to drive a nail through, and plugged the outlet atop the pot sufficiently so that gas now went in two directions—into tank # 95 through the drain system as well as into the atmosphere. This created an explosive situation in tank # 95. It wouldn't have had to plug the vent completely, just enough to create some back pressure. It is also possible that there was a little bit of previous build up, but with a substance like stearin, it would only take one run in the converter to create this type of build up.

"It is not easy to make hydrogen gas explode. You've got to have the right conditions: Air, hydrogen gas and a source of ignition. So what we've done is establish a pathway for the gas to get into the tank. It couldn't help but to go down there—there were only three openings in the vent pot. One was blocked by condensed and hardened stearin, one had gas and misted stearin being forcefully fed into the pot, and the other was open and led to tank # 95. We've established the fact that the tank was atmospheric, which means that as the gas went down there it came into equilibrium with the air around it, which formed an air-gas mixture in the tank. If you fill a tank that large with air and gas, you've got a bomb. Now this man, Kelvin Goodwin, has to go to the top of the tank to check its levels. It's done periodically when you're transferring oil. He would've opened the hatch at the top to look inside. Now we establish the third element which creates the explosive situation, the source of ignition. He had a light bulb

hanging on a threadbare wire, which I understand never worked properly. It's my understanding that he could not get his flashlight to work (the battery couldn't ignite the gas anyway) so he reached up to fiddle with the light to try to get it to work. That's when the explosion took place.

"It seems obvious to me who is at fault. The company is, it's elementary. No question. It was an unsafe installation and the company had not made anyone operating in the area aware that there was even the slightest possibility there was hydrogen gas in the area. If I had known about the situation, I would have hit the roof. There's no way you *ever* communicate gas back into the building. I don't know who in the company or even if the company knew of the rigged system.

"Some places you may find independent, non-connected expert witnesses in this area would be the gas companies who supply hydrogen gas. Air Products & Chemicals, for instance, supply [*sic*] gas to Karlshamns. If they heard a venting system description like this one, they'd come up off their seats. * * * "

Woodrow W. George, a former supervisor in the sanitation department at the plant, provided an affidavit in which he testified that he had been working on the roof of the plant during the summer of 1989 when the "smell" of hydrogen gas attracted his attention to a vent pot on the roof. He and two co-workers discovered that the vent pot was clogged. George went to get the plant manager, Ron Simmons. He then showed Simmons and another senior management employee how the vent pot was clogged up. His affidavit continues:

" * * * I explained to them that it would blow up if it was left like that. I told them that the air around the vent was too cold and the cold air was 'setting the oil up,' or hardening it, and that was why it was clogged. I also told them that if they put a filter and heat tracer on it that it may be a little safer. After that, Ron took me down to Alex Boeriu's office * * *.

"Ron told Alex to go with me and look into the problem that I had told Ron about. Alex and I then went to the roof and I showed him the vent pot. I told him the same thing I had told Ron and Bill and what I thought could be done to fix it. I showed him how the vent pot was clogged up and explained that the surrounding air was too cold, was hardening the oil, causing the clog, and would blow up. Alex told me how the venting system worked and said the gas *was* escaping into the atmosphere, like it should, and there was no danger.

"Just the fact that we were sent up on the roof to clean off the oil shows that there was a problem. If the vent pot was operating properly and was not clogged, then the oil would be draining back down the line to the tank like it should instead of ending up on the roof. We were on the roof several days and

during that time the only work done on the vent pot was for Maintenance to set it back up.

"While I was telling Alex Boeriu about the problem with the vent pot after we were back in the building, Jim Theado and Bob Dixon (Jim is Maintenance Superintendent and Bob was the plant engineer) were present and I told them the same thing that I had been telling Ron and Alex. The pot was dangerous, may blow up, and had to be fixed. I told them it was clogging up because the air around it was too cold. The cold air was hardening the oil which was supposed to be draining back down to the tank, clogging up the venting system. * * * "

In addition to the affidavit, a deposition of George was appended to the motion for summary judgment. In addition to the information in the affidavit, George described a smell he associated with hydrogen in use at the plant. He also described in some detail the process, fixtures and equipment involved in the plant near where the explosion occurred. Vegetable oil was hydrogenated in a tank. The gas with some oil vapors was allowed to vent through a one- to two-inch tube to the roof where the hydrogen escaped into the atmosphere, while some or most of the oil vapors solidified. The system was designed with a pipe which collected the oil which had solidified or at least turned into a liquid and funnelled the oil to a different tank, called "tank 95."

During the summer of 1989, the system was not working properly at least part of the time and some of the oil was coming out on the roof instead of being drained by the pipe to tank 95. George was aware of the potential for explosion from hydrogen gas. He suggested some modifications which he thought would help remedy the problem. The company made different modifications, which stopped the accumulation of vegetable oil on the roof of the plant and reduced the smell he associated with hydrogen gas on the roof of the plant; however, these modifications did not directly address that part of the clogging problem which presented the actual risk of hydrogen being diverted back into the plant and, thus, did not reduce the risk of explosion. In fact, the smell he associated with hydrogen gas was still present around the tanks inside the plant.

The deposition of appellant Kelvin L. Goodwin was appended to the motion for summary judgment. Goodwin had worked for Capital City for over sixteen years as of the date of the explosion. On that date, he had been measuring the amount of vegetable oil in various tanks at the plant. He was getting ready to measure the oil in tank 95. He noticed that the area around the tank was dark and he knew there was a "light bulb with string" above the tank. He climbed the ladder bolted to the tank to get to the string to turn on the light. He pulled the string and the light fixture sparked, igniting the gloves he was wearing. He jumped off the ladder and then the explosion occurred. He suffered extensive injuries from burns.

In response to interrogatories, Capital City indicated:

"Was there, on December 8, 1989, an explosion involving holding tank # 95?

"ANSWER: Yes.

" * * * [P]lease state the * * * cause of said explosion * * *.

"ANSWER: Exact cause unknown. It appears that hydrogen was somehow contained in T–95 and was ignited."

Robert Dixon, the plant engineer, provided an affidavit in which he testified that the storage tank which exploded was designed to store vegetable oil, not the hydrogen which was used to hydrogenate the vegetable oil. Dixon indicated that Capital City had, to the best of his knowledge, no prior hydrogen explosions during its history of over sixty years.

In addition to his affidavit, a deposition of Robert Dixon was before the trial court. His testimony for the most part paralleled that of Alex Boeriu, the manager of engineering for Capital City, as to details of the plant. The testimony generally was favorable to his employer.

Alex Boeriu also provided an affidavit. In addition to his affidavit, a deposition of Boeriu was filed for the trial court's review. The deposition revealed that Capital City had no devices in the area of tank 95 to detect the presence of hydrogen gas. The rationale was that hydrogen gas was not supposed to be in the area of tank 95, as opposed to the tanks where hydrogenation actually occurred. Boeriu also described in detail the process and equipment in use in the plant which could theoretically be linked to the explosion.

Construing the above factual information most favorably to appellants, Capital City was aware that the system for venting the mixture of vegetable oil vapors and hydrogen gas was malfunctioning in 1989. Some corrective measures were taken, but the corrective measures did not prevent a mixture containing hydrogen gas from being diverted back into the interior of the plant, specifically into tank 95. (Indeed, by unclogging the pipes leading into tank 95, the remedial measures increased the risk of explosion of which Capital City had been warned.) Once the hydrogen gas was permitted to collect in such an enclosed space, the risk of an explosion was significant, especially given the antiquated electrical fixtures in use near and over the various tanks.

Despite all this, a showing of a significant risk of an explosion does not constitute a showing that an explosion was a substantial certainty. Karlshamns certainly could have been considered reckless in its failure to address the problems at its plant more aggressively. However, a reckless tort is not sufficient to allow recovery against one's employer. An intentional tort must be

demonstrated to allow recovery.  Applying the harsh test set forth in *Fyffe v. Jeno's, Inc., supra,* summary judgment was appropriate.

The assignment of error is overruled.  The judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

WHITESIDE and BOWMAN, JJ., concur.