**TAULBEE et al., Appellants,**

v.

**ADIENCE, INC., BMI DIVISION, Appellee.**

[Cite as *Taulbee v. Adience, Inc., BMI Div.* (1997), 120 Ohio App.3d 11.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 96APE11–1502.

Decided May 29, 1997.

**12**

*McCarthy, Palmer, Volkema, Boyd & Thomas, Robert G. Palmer* and *Michael S. Miller*, for appellants.

*Isaac, Brant, Ledman & Teetor, Douglas J. Suter* and *Marc J. Kessler,* for appellee.

LAZARUS, Judge.

Plaintiffs-appellants, Terry M. Taulbee and Andra E. Taulbee, appeal from the judgment of the Franklin County Court of Common Pleas granting the motion for summary judgment of defendant-appellee, Adience, Inc., BMI division ("BMI"), on an employer intentional tort claim. Because the Taulbees have set forth evidence which, if believed, would permit reasonable minds to come to different conclusions as to the essential issues of the case, we reverse the judgment of the trial court.

Terry M. Taulbee was employed by BMI as a laborer. On November 11, 1993, he fell from a scaffold while working at the Gavin Nuclear Power Plant in Cheshire, Ohio. Ohio Power Company, a subsidiary of American Electric Power, owned and operated the Gavin Power Plant and had contracted with Pullman Power Products to perform work in connection with a project to reduce emissions of sulfur dioxide. Pullman retained BMI to remove gunnite from the interior walls of large air-handling units at the plant, known as plenums. Gunnite is a mixture of cement and sand which had been applied to the interior surfaces of the plenum and was reinforced with metal reinforcing bar ("rebar") and metal lathe. The plenum was a huge hourglass-shaped structure with a manhole-type hatch to allow access. The workers referred to it as the "hole." It was dark inside, and the workers were dependent upon stringers of lights for their only light source inside the plenum.

Due to the height of the plenum, it was necessary to construct several levels of scaffolding. Workers using jackhammers would break up the gunnite, and other workers called "burners" would follow, using acetylene cutting torches to free the debris hanging from the walls of the plenum. At the direction of their foreman, Richie Costa, Taulbee and other members of his crew removed scaffolding boards, making it easier for the accumulated gunnite to fall, saving time and money in disposing of the debris. Scaffolding boards were also removed to allow the employees using jackhammers to sit down to do their work. In some areas this left only two eight-inch-wide boards in places for the crew to work on.

Costa testified by way of deposition that the planking and the scaffolding were not safe and that there were never enough planks on a particular level to enable the crew to perform its work safely. Costa reported the problem with the scaffold to his supervisor, Bill Slean, but the problems with the scaffolding were not corrected until after Taulbee's fall. Prior to the accident, several employees, including members of BMI management, suffered falls or near falls. Preston

Messer, an employee in Costa's crew, was operating a cutting torch when he slipped and fell back into an uncovered material chute. Two other employees grabbed Messer and pulled him to safety. Messer informed his union steward about the lack of a cover over the chute, and Costa had the workers lay pieces of plywood over the chute opening. Later, Costa almost fell down the material chute when he was leaning on its plywood cover. Another near fall occurred the day before Taulbee's accident. Richard Brickey, foreman for another crew, got into a discussion with Bill Slean about the unsafe scaffolding, and Slean nearly fell. Brickey testified:

"Well, when me and him were sitting there arguing about it, he steps down on the plank board that wasn't wired and wasn't nailed down and he goes through it. I grabbed him or the man would have fell. I grabbed him. The next day, Mike [Taulbee] falls."

BMI presented evidence that safety harnesses, safety belts, and lanyards were provided, but several employees testified that they were not issued such equipment and that there wasn't enough equipment for everybody. Even if such equipment were available, the testimony of the workers was that there were no lifelines and in any event no safe areas where they could tie themselves off.

For two or three weeks prior to the accident, the lights in the plenum would go out with no warning for periods of time ranging from a few seconds to an hour or two. When this happened, the entire worksite was plunged into total darkness. Employees complained everyday to Costa about the lights. Costa testified that the most critical safety hazard on the job site was the lights. When asked why that was, he answered, "Because we're working on a very dangerous situation. And when the lights would go out, you couldn't see your hand in front of your face."

BMI instructed its employees that when the lights went out they were to stay put and not to move until the lights came back on. BMI management complained about the lighting problem to the general contractor, Pullman Power, explaining that BMI was losing money paying its employees while they were sitting around in the dark waiting for the lights to come back on. Barry Glasser, an employee of Pullman, instructed BMI management to document its downtime, but the underlying problem remained uncorrected in the area where Taulbee was working.

Jim Bannister, a safety manager for American Electric Power, testified that a week before Taulbee's accident he had a confrontation with Costa and shut the project down for safety violations. Bannister was highly critical of Costa, testifying:

"I had a little small confrontation with him. His guys were using the lighting for power tools, and they'd go in and run a plug in the lighting, and then use grinders or what have you. And that's strictly against the standard. It should be dedicated for lights only. And this was tripping the lights out; plus, when they would string the lights out—and I'm saying BMI would string out their lights—the—none of the rec—— none of the plugs were taped and signed or, you know, or had some kind of identification on it that it was for confined space lighting. And we had written violation after violation on this item, plus other items; like the scaffolding. He had these guys taking the scaffold boards out so they could get down below the scaffolding to work. Once that happened, the integrity of the scaffolding was lost and you had open holes, which made it entirely against the OSHA standard and the Pullman standard. We shut them down the week before and made them get out of there and fix it all."

Richard Brickey, foreman for another crew, testified that for the first two weeks he was on the job the lights in the unit where he was working were going out a couple of times a day. Brickey complained until he got an electrician to wire the lighting directly into a power source so others could not unplug his lighting. Brickey stated that his power never went off after he got a direct power source.

Brickey also testified that his crew had flashlights and a radio inside the hole. Brickey testified that members of Costa's crew came to him and complained that Costa was making them work when they thought it was unsafe. Brickey advised Costa to rig his lighting so the lights would not be unplugged by other workers needing a power source. According to Brickey, Costa responded, "Well, that's not really necessary. That's a waste of time." Brickey replied, "Well, that may be a waste of time, but it's not worth a man's life."

On the day of the accident, Taulbee had been on the job site only eight days, although the gunnite removal project had started earlier in the fall of 1993. Taulbee was assigned to work that day as a burner. He testified that while he was moving from one area of scaffolding to another he was attempting to walk on two eight-inch scaffolding boards. The lights went out as he was midstride, causing him to lose his balance. Taulbee testified that, when the lights went out he reached for the scaffolding support, but missed it in the dark and fell. Several workers testified that after the accident, but even before Taulbee was removed from the plenum, BMI quickly tried to replace scaffolding boards to cover up the many openings in the scaffolding floor.

Taulbee initiated suit, seeking damages for injuries sustained as a result of BMI's commission of an employer intentional tort. Claims against other defendants were either dismissed or settled.

The trial court granted summary judgment in favor of BMI, holding that while the evidence "certainly raises questions regarding [BMI's] safety practices," the evidence was insufficient to create a genuine issue of material fact regarding BMI's knowledge that injury from the intermittent failure of the lighting was a substantial certainty. Appellants assert a single assignment of error:

"The trial court erred to the substantial prejudice of plaintiffs-appellants in granting the motion for summary judgment of the defendant-appellee, Adience, Inc."

Appellate review of summary judgments is *de novo*. *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 588, 641 N.E.2d 265, 271–272; *Midwest Specialties, Inc. v. Firestone Tire & Rubber Co.* (1988), 42 Ohio App.3d 6, 8, 536 N.E.2d 411, 413–414. Summary judgment is appropriate only if there is no genuine issue of material fact; the moving party is entitled to judgment as a matter of law; and, construing all evidence in favor of the nonmoving party, reasonable minds could reach only a conclusion in favor of the moving party. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47–48. Viewing all facts in a light most favorable to the nonmoving party, the court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Turner v. Turner* (1993), 67 Ohio St.3d 337, 340, 617 N.E.2d 1123, 1126. An intentional tort issue goes to a jury only if there is probative evidence which, if believed, would permit reasonable minds to come to different conclusions as to the essential issue of the case. *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 172, 539 N.E.2d 1114, 1116–1117.

The Supreme Court of Ohio in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraphs one and two of the syllabus, set forth the law applicable to an intentional tort action brought against an employer:

"1. Within the purview of Section 8(A) of the Restatement of the Law 2d, Torts, and Section 8 of Prosser & Keeton on Torts (5th Ed.1984), in order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. (*Van Fossen v. Babcock & Wilcox Co.*

[1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, modified as set forth above and explained.)

"2. To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty— is not intent. (*Van Fossen v. Babcock & Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph six of the syllabus, modified as set forth above and explained.)"

A review of post-*Fyffe* cases indicates that the courts continue to grapple with what facts are necessary under *Fyffe* to overcome a motion for summary judgment. The test for intent has been criticized as "invit[ing] lawyers and judges to engage in a subjective analysis of the facts on a sliding scale." *Baker v. United Protective Serv., Inc.* (Sept. 1, 1993), Hamilton Cty.App. No. C–910918, unreported, 1993 WL 332305 (Gorman, J., concurring separately). The three prongs of the *Fyffe* test are questions of fact, and resolution of such facts is, of course, the province of the trier of fact and not by way of summary judgment. *Maples v. Columbus Zoological Park Assn.* (1993), 91 Ohio App.3d 133, 631 N.E.2d 1105. However, in determining whether a case will survive a motion for summary judgment, a court must decide what degree of risk an employer can take before its conduct is legally considered to be, or can legally be inferred to be, an intentional act to injure. *Richie v. Rogers Cartage Co.* (1993), 89 Ohio App.3d 638, 644, 626 N.E.2d 1012, 1016. Thus, the determinative issue in many employer intentional tort cases is whether a genuine issue of material fact exists on the very question of the employer's awareness of the certainty of harm to which the plaintiff is subjected based upon the facts before the court.

With respect to the first prong of the *Fyffe* test, counsel for BMI conceded at oral argument that BMI was aware of the existence of the dangerous condition within its business operation. Moving about on scaffolding where boards have been removed and without warning being plunged into pitch-black darkness is without question a dangerous condition that falls outside the inherent dangers of a construction site. See *Bond v. Howard Corp.* (1995), 72 Ohio St.3d 332, 336, 650 N.E.2d 416, 419–420 (no question that a construction site is an inherently dangerous work environment); *Youngbird v. Whirlpool Corp.* (1994),

99 Ohio App.3d 740, 747, 651 N.E.2d 1314, 1318–1319, quoting *Brady v. Safety-Kleen Corp.* (1991), 61 Ohio St.3d 624, 631, 576 N.E.2d 722, 727 ("dangerous condition" at issue must be one which falls outside the "natural hazards of employment").

With respect to the second prong of the *Fyffe* test, a number of appellate districts have equated the term "substantial certainty" with "high probability" in the context of employer intentional torts. *Martin v. GMC* (Sept. 27, 1996), Trumbull App. No. 96–T–5387, unreported, at 6, 1996 WL 586765; *Brunn v. Valley Tool & Die, Inc.* (Nov. 9, 1995), Cuyahoga App. No. 68811, unreported, at 5, 1995 WL 662115; *Stump v. Indus. Steeplejack Co.* (1995), 104 Ohio App.3d 86, at 92, 661 N.E.2d 212, at 216–217; *Guillozet v. Allied Signal, Inc.* (Mar. 2, 1994), Darke App. No. 1333, unreported, at 12, 1994 WL 100722; *Richie v. Rogers Cartage Co.*, 89 Ohio App.3d at 644, 626 N.E.2d at 1016; *Buccione v. Cincinnati, Inc.* (Dec. 13, 1991), Huron App. No. H–90–27, unreported, at 9, 1991 WL 639760. This court has stated that a showing of a "significant risk" of an explosion does not constitute a showing that an explosion was a substantial certainty. *Goodwin v. Karlshamns USA, Inc.* (1993), 85 Ohio App.3d 240, 246, 619 N.E.2d 508, 512–513. The standard has been described as "harsh," *id.* at 247, 619 N.E.2d at 513, and one court has noted that the Supreme Court of Ohio has defined the breadth of employer intentional torts very narrowly out of a concern " 'that an expansive interpretation would thwart the legislative bargain underlying workers' compensation by eroding the exclusivity of both the liability and the recovery provided by workers' compensation.' " *Kincer v. Am. Brick & Block, Inc.* (Jan. 24, 1997), Montgomery App. No. 16073, unreported, 1997 WL 24808, quoting *Spates v. Jones* (July 12, 1995), Montgomery App. No. 15057, unreported, at 4, 1995 WL 416487.

On the other hand, one court of appeals has stated, "[T]he pendulum has seemingly been swung by several courts, including our own, too far the other way, *i.e.*, unnecessarily restricting the test for intentional tort." *McDonald v. Contractors & Indus. Builders* (Aug. 26, 1992), Scioto App. No. 91 CA 2005, unreported, 1992 WL 209499. See, also, *Gibbs v. Simcote, Inc.* (Oct. 6, 1993), Marion App. No. 9–93–15, unreported, 1993 WL 415315, reversed on the authority of *Fyffe*, 71 Ohio St.3d 651, 646 N.E.2d 1108; *Duckworth v. Creative Interglobal, Inc.* (May 5, 1994), Cuyahoga App. No. 65449, unreported, 1994 WL 173484, reversed on the authority of *Fyffe*, 74 Ohio St.3d 12, 655 N.E.2d 1299. Instead, as the Supreme Court of Ohio has suggested, the standard "emerges not so much from the words used to formulate the test as it does from the decisions rendered in response to specific fact situations. Such is the nature of the common law." *Kunkler v. Goodyear Tire & Rubber Co.* (1988), 36 Ohio St.3d 135, 139, 522 N.E.2d 477, 481.

In support of its contention that it did not know that harm was a substantial certainty, BMI submitted evidence that it provided safety instructions and fall protection to its employees. Genuine issues of material fact exist as to whether such fall protection gear was actually available. Various employees testified that they were not issued such equipment or there was a shortage of equipment, particularly lanyards. Also, even if the employees had safety harnesses and lanyards, there was testimony that there were no safe places to tie off to. Moreover, Taulbee's foreman testified that if the employee is "in transit, then he couldn't possibly be tied off." With respect to the lighting, BMI pointed out that the general contractor was responsible for the lighting inside the plenum, BMI foremen requested that the lighting situation be remedied, and Taulbee's foreman tried to remedy the situation by running supplemental lighting off of a separate electrical outlet. BMI instructed its employees in safety meetings that, when the lights failed, they were to freeze or stay put, and not to move when the lights went out. This instruction of course did not address the situation in which an employee was in mid-stride, as was Taulbee, when the lights failed.

BMI directs our attention to *Baggs v. Clarklift of Columbus* (Apr. 9, 1996), Franklin App. No 95APE11–1501, unreported, 1996 WL 166754, for the proposition that an employer's failure to correct inadequate lighting does not create a substantial certainty of injury or death. In *Baggs,* the plaintiff was injured when his hand came in contact with a bent fan blade while inspecting a forklift. The plaintiff maintained that the employer's failure to maintain adequate lighting caused his injury. This court determined that even if inadequate lighting constituted a dangerous condition and that the employer was aware of the lighting conditions, harm as a result of the condition was not a substantial certainty. "While it may be foreseeable that a chronic lack of light bulbs may eventually result in injury to an employee, this does not constitute substantial certainty." *Id.*

*Baggs* is distinguishable from the instant case. Part of this court's conclusion in *Baggs* was based on the fact that the plaintiff was an experienced mechanic who was not required to, but chose to, perform the inspection in the manner in which he did. In addition, this court noted that the employee had the option of borrowing supplemental lighting, and he was not required to perform the inspection without a drop light. This court noted that there were too many extraneous factors unrelated to the lighting of which the employer was unaware that contributed to the injury. In the instant case, the issue was not inadequate lighting but the complete absence of light. Taulbee and the other workers inside the plenum were totally dependent on a light source that periodically failed without warning and were constantly working on unsafe scaffolding. Although fall protection may have been available and the workers were instructed to

remain still when the lights went off, these options were simply not feasible for a worker such as Taulbee who was in mid-stride when the lights went off.

■ BMI next argues that it was not aware of any prior accidents involving the lighting until Taulbee's, and therefore, it was not substantially certain that injury would result. Prior accidents are probative of whether an employer knows that an injury is substantially certain to occur. In *Foust v. Magnum Restaurants, Inc.* (1994), 97 Ohio App.3d 451, 646 N.E.2d 1150, an employee of a fast food restaurant was injured while disposing of grease from the fryer vats. Protective gear was available, but the employee chose not to use it, and carried the container of oil without a lid and while it was still hot. This court held that the employee had failed to satisfy the second prong of the *Fyffe* test, in part because the procedure had been performed thousands of times without prior incident, and that the plaintiff himself had performed the grease disposal procedure over one hundred times during the course of a year without incident. The court stated that prior accidents are to be considered as one factor of knowledge that an injury is substantially certain to result, and that the absence of prior accidents "strongly suggests" that injury from the procedure was not substantially certain to result from the manner in which the job was performed.

Establishing the employer's knowledge of substantial certainty of harm is difficult where there are no prior accidents of a similar character, but a lack of prior accidents is not necessarily fatal to a plaintiff's case.

"Simply because people are not injured, maimed or killed every time they encounter a device or procedure is not solely determinative of the question of whether that procedure or device is dangerous and unsafe. If we were to accept the appellee's reasoning, it would be tantamount to giving every employer one free injury for every decision, procedure or device it decided to use, regardless of the knowledge or substantial certainty of the danger that the employer's decision entailed. This is not the purpose of *Fyffe*." *Cook v. Cleveland Elec. Illum. Co.* (1995), 102 Ohio App.3d 417, 429–430, 657 N.E.2d 356, 364.

In the instant case, the lack of prior accidents is of lesser significance given that the portion of the project in which Taulbee was involved had been going on for only a few weeks, and Taulbee himself had only been on the project for eight days. In addition, it is somewhat disingenuous for BMI to assert that it had no awareness of prior accidents involving lighting given that Taulbee has identified two problems, the scaffolding and the lighting, that he alleges together created a dangerous condition substantially certain to cause injury. Although BMI may have been unaware of prior accidents involving the lighting, there were several instances in which BMI employees, including two members of management, fell or nearly fell because of unsafe scaffolding.

■ Even without evidence of prior accidents due to lighting failure, the court must consider other factors indicating knowledge that injury is substantially certain. In *Palk v. S.E. Johnson Cos.* (Nov. 9, 1993), Franklin App. No. 93AP–573, unreported, 1993 WL 460602, this court stated that "[i]n the final analysis, absent some other evidence indicating that injury is substantially certain to occur, such as a number of prior accidents resulting from the dangerous condition, a determination of substantial certainty turns in large part on the nature of the dangerous condition." Thus, in determining whether the employer had knowledge that the dangerous condition was substantially certain to cause injury, we must focus not only on how often similar accidents have occurred, but on the employer's knowledge of the degree of risk involved.

For example, in *Ruby v. Ohio Dept. of Natural Resources* (Dec. 3, 1992), Franklin App. No. 92AP–947, unreported, 1992 WL 361817, an employee of the Civilian Conservation Corps was seriously burned fighting a forest fire. The plaintiff alleged that her employer's failure to provide her with clothing suitable for her responsibilities in fighting a fire amounted to an intentional tort. The clothing provided had a polyester content that melted and caused a more serious injury than would have occurred if the plaintiff had been provided suitable clothing. This court held that the employer had knowledge and was aware of the risk of sending its employee to fight a fire in clothing containing polyester. However, because the plaintiff's responsibility was to create firebreaks by raking fuel away from the fire, the probability of her coming close to the flames was remote. Accordingly, there was not a substantial certainty that the plaintiff would come in contact with the fire or that her clothes would catch on fire.

In *Richie*, *supra*, 89 Ohio App.3d 638, 626 N.E.2d 1012, an employee was severely burned using a flammable solvent to clean out the tank of a truck. The employer used far different (and safer) cleaning methods at another terminal, and the court found that the first employee had not been provided with the proper environment in which to use the product. This evidence supported a determination that the employer knew that, if its employees were required to use such a solvent in the first environment, then injury was substantially certain to occur.

We find the instant case to be more akin to the situation in *Richie*. Taulbee was responsible for burning off the rebar and metal lathe left hanging from the wall of the plenum after the jackhammerers had finished. BMI knew of the risks inherent in working at heights on a construction site, knew that Taulbee was to be working on scaffolding that had planks removed, and knew that at any time the work site could become pitch black. At least one BMI foreman concluded that the level of risk was simply unacceptable. Richard Brickey pulled his crew out until a scaffolding problem was corrected, and he arranged for the lights to be wired directly into a power source so they would not come unplugged.

Construing the evidence in the light most favorable to Taulbee, the nonmoving party, we conclude that a genuine issue of material fact exists as to whether the environment in which Taulbee was working created such an obvious hazard that BMI management knew that an injury was substantially certain to occur.

With respect to the third prong of the *Fyffe* test, BMI argues that Taulbee has failed to present any evidence that he was required to work under conditions where BMI knew to a substantial certainty that Taulbee would be injured. BMI points to portions of Taulbee's deposition in which he states that he never personally told his employer or his union steward that he felt the conditions were unsafe or that he did not want to work under those conditions.

■ We do not construe *Fyffe* to require an employee to personally complain to management or to refuse to perform an assigned task and then be ordered by the employer to do it anyway. Evidence of an act by the employer to require the employee to perform the dangerous task as part of his assigned job duties is sufficient to satisfy this condition. See *Fyffe, supra*, 59 Ohio St.3d at 116, 570 N.E.2d at 1110 ("As part of his job duties, Fyffe was required to clean conveyer belts used in appellee's production process.")

■ In this case, there was evidence that on the day of the accident, Costa assigned Taulbee to work as a burner. Taulbee's duties as a burner entailed moving from one part of the scaffold to another in order to cut away debris. In addition, there was testimony that many employees complained about the lighting, that complaints were made about the lighting every day, and that in spite of their complaints they were required to work. Preston Messer, a member of Taulbee's crew testified:

"Q. Do you know what was causing the lights to go out?

"A. I have no idea.

"Q. Did you ever bring that to anybody's attention?

"A. Every day.

"Q. Who would you—who would you tell?

"A. Rich, the safety man, our steward, and our steward would complain about it. A couple of times, we refused to go in the hole, but we had to go right back in."

Richard Brickey testified that Costa's workers complained to him that Costa made them work when they thought it was unsafe. Under these facts, Taulbee has set forth sufficient facts to withstand the motion for summary judgment.

Finally, before the trial court and here, BMI argues that Taulbee's intentional tort claim is preempted and barred by the Section 301 of the Labor Management Relations Act of 1947, Section 185, Title 29, U.S.Code. In *AllisChalmers v. Lueck* (1985), 471 U.S. 202, 220, 105 S.Ct. 1904, 1915–1916, 85 L.Ed.2d 206, 221,

the United States Supreme Court held that when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a Section 301 claim or dismissed as preempted by federal labor-contract law. "On the other hand, when a state-law claim can be resolved without interpreting the [collective bargaining agreement], the claim is independent of the agreement and is not preempted." *Honchell v. Gen. Elec. Co.* (1995), 100 Ohio App.3d 527, 530, 654 N.E.2d 402, 404, citing *Lingle v. Norge Div. of Magic Chef, Inc.* (1988), 486 U.S. 399, 413, 108 S.Ct. 1877, 1885, 100 L.Ed.2d 410, 423–424.

█ Although Taulbee was covered by a collective bargaining agreement, his right to recovery against BMI does not turn upon an interpretation of that agreement, and his state-law intentional tort claim exists independently of the collective bargaining agreement. BMI notes that the agreement contains provisions governing grievances, work rules, and health and safety.

BMI claims that the third prong of the *Fyffe* intentional tort test requires an analysis of these provisions as they are relevant to the issue of whether BMI required Taulbee to perform the dangerous task. In *Sibert v. Columbus* (Feb. 27, 1992), Franklin App. No. 91AP–522, unreported, 1992 WL 41253, the plaintiff was in a trench working on an exposed water main when he was struck and injured by a chunk of asphalt dislodged from the wall of the trench. This court held that evidence of the city's policy allowing an employee to object to participation in dangerous procedures was admissible on the issue of whether the plaintiff was required to continue to work under conditions known to be dangerous and substantially certain to cause harm. In the instant case, it is the existence of a grievance procedure that may have some relevance to the third prong of the test. The mere fact that the collective bargaining agreement contains these provisions does not make the existence or the contours of the intentional tort claim dependent upon the terms of the agreement. See *Lingle, supra*, 486 U.S. at 412–413, 108 S.Ct. at 1884–1885, 100 L.Ed.2d at 422–424. While the existence of such provisions may be relevant to the issue of whether Taulbee was required to perform a dangerous task, BMI has failed to demonstrate any reason an analysis of the above-referenced provisions is needed.

Based on the forgoing, the appellants' single assignment of error is sustained, the judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court for further proceedings in accordance with law, consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

JOHN C. YOUNG and PEGGY BRYANT, JJ., concur.