OPINION *Page 2 
{¶ 1} The plaintiffs-appellants, Gerry Quinn and Candy Quinn, appeal the judgment of the Allen County Common Pleas Court granting summary judgment to the defendant-appellee, MetoKote Corporation. On appeal, Quinn contends there are genuine issues of material fact, which render summary judgment inappropriate. For the reasons set forth herein, we reverse the judgment of the trial court.
 {¶ 2} MetoKote is in the business of coating metal parts for various customers, with facilities located across North America, including one in Lima, Ohio. In Building 3 of the Lima facility, MetoKote runs various "lines" depending on what type of coating a part should have. For example, some parts are powder coated and others are "e-coated." Gerry has been employed by MetoKote since 1989.
 {¶ 3} On December 26, 2002, MetoKote was on holiday shut down. Gerry was employed as a line leader, which is a supervisory role, and he had volunteered to do additional work during the shut down. On that day, Gerry and several other line leaders were assigned to clean the "pit" located between lines 33 and 34 in Building 3. Over time, the pit would accumulate "sludge," which employees were required to periodically remove with a power washer, spray bottles, and chisels. To perform this task, Gerry wore safety glasses, steel-toed boots, and vinyl gloves. *Page 3 
 {¶ 4} While cleaning the pit on December 26, 2002, Gerry decided to use a chemical called Parkoline 470, which employees referred to as "Parco," to help loosen the sludge. Gerry had used Parco to loosen the sludge in the pit on other occasions. He retrieved the Parco from the chemical storage area and transported it back to the pit in an open five-gallon bucket. As he descended the stairs[1] into the pit, he lost his footing. The Parco splashed out of the bucket and onto Gerry's legs, right arm, and right side of his face. The Parco also splashed under the safety glasses and into Gerry's right eye, causing blindness in that eye.
 {¶ 5} On December 27, 2004, Gerry and Candy filed a complaint in Allen County Common Pleas Court case number CV2004-1113 alleging one claim for an employer intentional tort and one claim for loss of consortium. MetoKote filed an answer, and on October 5, 2006, it filed a motion for summary judgment. On November 21, 2006, the Quinns filed the affidavits of Richard Triplett and Dave Carmack and two photographs. The notice of filing indicated that the affidavits and photographs were "attached to Plaintiff's Summary Judgment Response, and incorporated into said Response." However, the Quinns' response had not been filed. On November 27, 2006, MetoKote filed a reply memorandum. *Page 4 
 {¶ 6} On November 28, 2006, the Quinns dismissed the complaint pursuant to Civ. R. 41(A) and, on the same date, filed a new complaint in Allen County Common Pleas Court case number CV2006-1182 alleging the same causes of action as those filed in CV2004-1113. MetoKote filed its answer, and on January 4, 2007, the Quinns filed their response to MetoKote's motion for summary judgment, which had been filed in CV2004-1113. On January 8, 2007, the trial court filed an order transferring all pleadings and documents from CV2004-1113 to CV2006-1182, and on May 16, 2007, the court filed a judgment entry granting summary judgment to MetoKote. The Quinns appeal the judgment of the trial court, asserting one assignment of error for our review.
 Assignment of Error The trial court committed prejudicial error against Quinn when it granted summary judgment, finding as a matter of law that MetoKote did not have knowledge that harm to Quinn was substantially certain.
 {¶ 7} An appellate court reviews a grant of summary judgment de novo, independently and without deference to the trial court's decision.Ohio Govt. Risk Mgt. Plan v. Harrison, 115 Ohio St.3d 241,2007-Ohio-4948, 874 N.E.2d 1155, at ¶ 5, citing Comer v. Risko,106 Ohio St. 3d 185, 2005-Ohio-4559, 833 N.E.2d 712, at ¶ 8. "A grant of summary judgment will be affirmed only when the requirements of Civ. R. 56(C) are met." Adkins v. Chief Supermarket, 3d Dist. No. 11-06-07, 2007-Ohio-772, at ¶ 7. The party moving for summary judgment must *Page 5 
establish: (1) that there are no genuine issues of material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party, said party being entitled to have the evidence construed most strongly in his favor. Id., citing Civ. R. 56(C); Horton v. Harwick Chem. Corp., 73 Ohio St.3d 679,1995-Ohio-286, 653 N.E.2d 1196, paragraph three of the syllabus. In ruling on a motion for summary judgment, a court may not "weigh evidence or choose among reasonable inferences * * *." Adkins, at ¶ 8, citingJacobs v. Racevskis (1995), 105 Ohio App.3d 1, 7, 663 N.E.2d 653. Rather, the court must consider the above standard while construing all evidence in favor of the non-movant. Jacobs, at 7.
 {¶ 8} The party moving for summary judgment must identify the basis of the motion to allow the non-movant a "meaningful opportunity to respond." Mitseff v. Wheeler (1988), 38 Ohio St .3d 112, 116,526 N.E.2d 798. In its motion, the moving party "must state specifically which areas of the opponent's claim raise no genuine issue of material fact" and must support its assertion with affidavits or other evidence as allowed by Civ. R. 56(C). Mitseff, at 115, citing Harless v. Willis DayWarehousing Co. (1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46, citingHamlin v. McAlpin Co. (1964), 175 Ohio St. 517, 519-520, 196 N.E.2d 781;Dresher v. Burt, 75 Ohio St.3d 280, 293, 1996-Ohio-107, 662 N.E.2d 264. If *Page 6 
the moving party fails to meet its burden, summary judgment is inappropriate; however, if the moving party meets its initial burden, the non-moving party has a "reciprocal burden outlined in Civ. R. 56(E) to set forth specific facts showing that there is a genuine issue for trial * * *." Dresher, at 294.
 {¶ 9} MetoKote's motion for summary judgment focuses only on the "intent" element of an employer intentional tort. The Ohio Supreme Court has provided guidance on that issue. To prove "intent," the plaintiff must show:
 (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.
 To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk-something short of substantial certainty-is not intent. *Page 7 
Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, at paragraphs one and two of the syllabus.
 {¶ 10} Effective April 7, 2005, the General Assembly enacted R.C. 2745.01 to modify the definition of an employer intentional tort. The statute essentially defines "substantially certain" as "intent."Talik v. Federal Marine Terminals, Inc., 117 Ohio St.3d 496,2008-Ohio-937, 885 N.E.2d 204, at ¶ 17, quoting R.C. 2745.01(B). By enacting R.C. 2745.01, the legislature rejected "the notion that acting with a belief that injury is substantially certain to occur is analogous to wanton misconduct as defined in Universal Concrete [Pipe Co. v.Bassett (1936)], 130 Ohio St. 567, 200 N.E. 843, paragraph two of the syllabus." Talik, at ¶ 17. However, since Gerry's injury occurred before the enactment of R.C. 2745.01, the Fyffe standard, set forth above, still applies. Id.
 {¶ 11} In its motion for summary judgment, MetoKote argued that Gerry could not prove it had knowledge of a dangerous process or procedure in its place of business. MetoKote conceded that employees carried chemicals in open five-gallon buckets; however, it argued that nobody complained about doing so, and nobody found the practice to be unsafe. In response, Gerry alleged that MetoKote's "Supervisors, Safety Coordinators, Managerial Staff, including Plant Managers and Maintenance Supervisors" observed chemicals being transported in open five-gallon buckets. *Page 8 
 {¶ 12} The record indicates genuine issues of material fact as to whether MetoKote had actual knowledge of several dangerous procedures or processes occurring within its facility. First, there is a question of fact as to whether MetoKote knew its employees were using Parco or similar chemicals to clean the pit. In his deposition, Gerry testified that prior "supervisors," including Rex Deal, Vern Sorrells, and Bob Bigelow, had told him to use Parco or a similar chemical to clean the pit. (Dep., Quinn, Gerry, Nov. 8, 2006, at 58). Gerry indicated there was no policy at MetoKote for cleaning the pit, and employees learned how to do the job from other employees. Dave Carmack also indicated that MetoKote "had no established system or training for cleaning the `pit.'" (Aff., Carmack, Dave, Nov. 21, 2006, at ¶ 25). Carmack stated that MetoKote essentially did not care how the pit was cleaned as long as it was clean. (Id. at ¶ 26). Mark Schofield testified that although he never cleaned the pit, he had observed other employees doing so. (Dep. Schofield, Mark, Nov. 8, 2006, at 31-32). Schofield alleged that the employees would put a powder chemical[2] into an open five-gallon bucket and add water before cleaning the pit. (Id.). Finally, Richard Triplett, who left MetoKote in 1997, stated that there was no procedure for cleaning the pit. (Aff, *Page 9 
Triplett, Richard, Nov. 21, 2006, at ¶ 39).[3] Triplett stated that employees learned to clean the pit from one another, and the employees who cleaned the pit used a process cleaner to remove the sludge. (Id. at ¶ 39; 42).
 {¶ 13} Ross Skaggs, the corporate safety manager for MetoKote, testified that MetoKote had no written procedure allowing the use of Parco to clean the pit, but at the same time, there was no written policy preventing employees from using Parco to clean the pit. (Dep., Skaggs, Ross, Nov. 8, 2006, at 142). James Bender, the plant manager, testified that he found no evidence that employees were trained to use Parco to clean the pit. (Dep., Bender, James, Nov. 8, 2006, at 111). He stated that he would never authorize the use of Parco for cleaning the pit. (Id.). The record also indicated that a "safety analysis" had never been completed for the task of cleaning the pit.
 {¶ 14} Gerry's testimony creates a genuine issue of material fact as to whether MetoKote knew employees were using process cleaners to clean the pit. Since Gerry's "supervisors" had previously instructed him to use Parco and a similar process cleaner, MetoKote could be charged with knowledge of the chemicals' use. As to the dangerousness of the chemical and the appropriateness of its use in cleaning the pit, Gerry apparently believed that Parco *Page 10 
was simply a detergent. (Dep., Quinn, at 59-60). However, Skaggs testified that Parco is not a detergent for cleaning floors, but is a process cleaner intended for use in a chemical bath to clean the parts being coated. (Dep., Skaggs, at 141). Jacobs also testified that Parco is not a cleaning agent. (Dep., Jacobs, at 98).
 {¶ 15} Second, there are genuine issues of fact as to whether MetoKote knew its employees were wearing safety glasses rather than chemical goggles when they cleaned the pit. MetoKote instituted a safety glasses policy, effective September 1, 2002, which provided that all employees were required to wear either safety glasses or impact resistant goggles. The policy stated that additional eye protection "may be necessary according to the plant hazard analysis." The safety handbook stated that MetoKote would provide personal protective equipment (PPE); that instruction would be provided to employees about the chemicals used in the facility; and that "[t]here should be an extensive analysis of the personal protection equipment and proper clothing for each job." Additionally, the material safety data sheet (MSDS) for Parco contained a PPE section, which stated, "Eyes/Face Protective Equipment: Wear chemical goggles face shield (if splashing is possible)." (Pl.'s Response to Summ. J. Mot., Jan. 4, 2007, at Ex. R). The parties do not dispute that Gerry was wearing safety glasses when he was injured. *Page 11 
 {¶ 16} In his deposition, Gerry testified that he was given a power washer and spray bottles to clean the pit. (Dep., Quinn, at 53-54). He indicated that PPE were not available at the battery charging station, though other witnesses stated that PPE, including chemical goggles, were available at that location. (Id. at 69; Dep., Skaggs, at 108). Gerry also testified that he knew MetoKote had chemical goggles, but he did not believe he needed them. (Id. at 71). Jacobs testified that he was never trained to wear goggles when using chemicals; that he was never advised to wear goggles around chemicals; and that he never received a pair of goggles. (Dep., Jacobs, at 106; 118; 121). Finally, Carmack stated that no PPE was required except for safety glasses and steel-toed boots. (Aff., Carmack, at ¶ 9).
 {¶ 17} In his deposition, Skaggs testified that he had never completed a safety analysis for the task of cleaning of the pit. In his deposition, Bender stated that he had previously managed the MetoKote facility in Peru, Illinois. (Dep., Bender, at 43-44). At that facility, employees were required to wear chemical goggles when cleaning the pit. Bender essentially stated that simply using the power washer created the risk that debris could blow under the safety glasses and into an employee's eyes. As plant manager, Bender knew the importance of wearing goggles to clean the pit, even when the use of acidic, liquid chemicals was not at issue. The record also contains statements by several witnesses that neither *Page 12 
safety glasses nor face shields would prevent an employee from being splashed in the eyes, and the only PPE that would offer that protection was chemical goggles.
 {¶ 18} Third, there are genuine issues of material fact as to whether MetoKote knew its employees were carrying chemicals in an open bucket. Gerry testified that there was one bucket available for employees to use, and there was never a lid for it. (Dep., Quinn, at 60). Gerry testified that chemicals used to be manufactured as powders but now they are produced in liquid form, and employees still transport the liquid chemicals in an open five-gallon bucket. (Id. at 61). Gerry indicated that he never complained about transporting chemicals in the five-gallon bucket because he thought the procedure was safe; however, he also stated that he did not want to get any chemical on himself because it was not safe. (Id. at 39; 40; 42).
 {¶ 19} Jacobs testified that he was not taught how to safely transport chemicals. (Dep., Jacobs, at 32). Jacobs stated that chemicals were transported in open five-gallon buckets, which could spill though he was not aware of any injuries. (Id. at 40; 42). Schofield testified that employees always carried chemicals in open five-gallon buckets. (Id. at 101). Regardless of the testimony, MetoKote has conceded that its employees carried chemicals in open five-gallon buckets. *Page 13 
 {¶ 20} Skaggs testified that transporting chemicals in an open, five-gallon bucket was inappropriate. (Dep., Skaggs, at 121). In particular, he indicated that Parco was not meant to be transported in a bucket. (Id. at 143). During his deposition, Bender stated he did not know employees were transporting chemicals in buckets until Gerry was injured. (Dep., Bender, at 101).
 {¶ 21} Fourth, there are genuine issues of material fact as to whether the stairs into the pit were dangerous. Skaggs testified that during his safety analysis, he only checked the railing around the top of the pit and ensured that there was a chain across the top of the stairs to prevent anybody from falling into the pit. (Dep., Skaggs, at 53). Skaggs also stated that carrying chemicals down a set of stairs was "extremely hazardous," and Gerry should have been wearing more protective PPE when he did so. (Id. at 70). Carmack testified that he told MetoKote's safety committee that the stairs into the pit were unsafe. (Aff., Carmack, at ¶ 18). Carmack complained after he noticed how slippery the stairs became while cleaning the pit. Essentially, the employees' boots would collect sludge on the soles, and as they carried buckets of sludge out of the pit for disposal, the sludge would wear off of the boots and onto the metal stairs resulting in a slippery set of stairs. (Id. at ¶ 24).
 {¶ 22} Finally, there are genuine issues of material fact as to whether employees had training on the location of MSDS and PPE and where those items *Page 14 
were actually located. Gerry testified that he could not remember training on either MSDS or PPE; however, regardless of whether he had been trained on location, there were no MSDS "in the shop." (Dep., Quinn, at 37). Jacobs testified that the MSDS were in the foreman's office, but he was not taught about the location of PPE. (Dep., Jacobs, at 32-33). Later, Jacobs indicated that goggles were available; however, they were in a locked locker in the foreman's office. (Id. at 99). He also stated that MSDS were not located near the chemicals.
 {¶ 23} Schofield testified that he was never told where the MSDS were located. (Dep., Schofield, at 38). He also stated that his supervisors told him chemicals would not hurt him, and if he got any chemicals on him, he should just wash them off. (Id. at 44). Carmack indicated that MetoKote did not disclose the dangers of the chemicals employees used or the appropriate PPE to use with the chemicals. (Aff., Carmack, at ¶ 11-12). Carmack also stated that after Gerry's accident, he was sent to find the MSDS for Parco. He stated it took a long time to figure out how to treat a spill because the MSDS book was "hap hazard." (Id. at ¶ 37-38).
 {¶ 24} Calvin Klickman, the safety coordinator, testified that he conducted a safety analysis of the handling and transportation of chemicals. (Dep., Klickman, Calvin, Nov. 8, 2006, at 70). However, the record seems to reflect that the analysis was not completed until after Gerry's injury. Skaggs testified that *Page 15 
how a chemical was being used determined what PPE an employee should use. (Dep., Skaggs, at 68).
 {¶ 25} Undoubtedly, working with and around acidic chemicals is a dangerous job; however, each of the factors discussed above seem to have played some role in Gerry's injury, and each of the factors raised the odds that an employee would be injured. Thus, while some of the individual factors may not rise to the level necessary to constitute an intentional tort, reasonable minds could differ as to whether any one factor or any combination of factors were outside the "`natural hazards of employment.'" Youngbird v. Whirlpool Corp. (1994),99 Ohio App.3d 740, 747, 651 N.E.2d 1314, quoting Brady v. Safety-Kleen Corp. (1991),61 Ohio St.3d 624, 631, 576 N.E.2d 722, 727, citing Blankenship v.Cincinnati Milacron Chemicals, Inc. (1982), 69 Ohio St.2d 608,433 N.E.2d 572. Construing the facts in favor of the non-movants, the Quinns, a jury could find that MetoKote knew of a dangerous process, procedure, or condition within its workplace.
 {¶ 26} The second element of Fyffe requires that MetoKote know that harm to the employee will be a substantial certainty if the employee is subjected to the dangerous process, procedure, or condition in the workplace. This case is premised upon what the Supreme Court has called a "`substantial certainty' intentional tort." Penn Traffic Co. v. AIUIns. Co., 99 Ohio St.3d 227, 2003-Ohio-3373, *Page 16 790 N.E.2d 1199, at ¶ 6. "This type of `employer intentional tort' occurs when the employer does not directly intend to injure the employee, but acts with the belief that injury is substantially certain to occur. Van Fossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100,522 N.E.2d 489. `[W]here substantial certainty exists, intent to harm will be inferred as a matter of law.' Buckeye Union Ins. Co. v. NewEngland Ins. Co. (l999), 87 Ohio St.3d 280, 289, 720 N.E.2d 495 (Cook, J., concurring in judgment only)." Id.
 {¶ 27} Gerry produced several of MetoKote's internal accident report forms to show that MetoKote knew the dangers associated with chemicals. Many of the accident report forms show chemical burns resulting from liquid chemicals being splashed onto employees' lower extremities. (Pl.'s Resp. to Summ. J. Mot., at Exs. J, K, O). Exhibit K resulted after liquid chemicals splashed into an employee's eye while she was cleaning a five-gallon bucket. The employee was injured on November 14, 2002. Exhibit L resulted after an employee using a power washer splashed chemicals and water under his face shield and safety glasses. The employee was injured on October 28, 2002. Exhibit O contains various accident reports for chemical burns sustained by employees who were splashed with liquid chemicals. Exhibit O also contains one injury report for an employee who was splashed in the eye with a mixture of water and a chemical in powder form. He was injured on September 17, 1999. Gerry also attached some *Page 17 
of MetoKote's OSHA reports from 1996 through 1999 and 2002. The sheets showed several employees injured as the result of chemical burns. (Id. at Ex. Q).
 {¶ 28} To show that it did not know injury was substantially certain, MetoKote argued that there have been no other injuries in its facility similar to Gerry's. However, the absence of "prior accidents is not necessarily fatal to a plaintiff's case." Klaus v. United Equity,Inc., 3d Dist. No. 1-07-63, 2008-Ohio-1344, citing Taulbee v. Adience,Inc., BMI Div. (1997), 120 Ohio App.3d 11, 20, 696 N.E.2d 625, citingCook v. Cleveland Elec. Illum. Co. (1995), 102 Ohio App.3d 417, 429-430,657 N.E.2d 356. As this court has previously stated, the substantial certainty test does not entitle employers to "one free bite." Miller v.Trafzer, 150 Ohio App.3d 695, 2002-Ohio-6800, 782 N.E.2d 1200, at ¶ 13, citing Gibson v. Drainage Prods., Inc., 3d Dist. No. 11-99-14, 2002-Ohio-6258, at ¶ 17. Furthermore, the record is not devoid of any accidents. While there is no evidence of somebody being injured while carrying Parco in an open five-gallon bucket down the stairs into the pit while wearing safety glasses, there is evidence of people being burned by chemicals and evidence of people receiving eye injuries when chemicals have been able to splash around or under safety glasses.
 {¶ 29} Exhibit N to the Quinns' response memorandum was MetoKote's safety glasses policy, which was effective September 1, 2002. MetoKote's policy required employees to wear safety glasses, plano safety glasses, or impact resistant *Page 18 
goggles. The second page of the policy stated, "Further eye protection may be necessary according to the plant hazard analysis. (Chemical splash goggles, Full-face respirators, face shields over safety glasses, etc.)" (Id. at Ex. N). Requiring goggles as "further protection" indicates that they offer better eye protection than safety glasses.
 {¶ 30} The MSDS for Parco, attached to the response memorandum as Exhibit R, contained a section for "Hazards Identification." In that section, the sheet stated, "DANGER — CORROSIVE! Contact with this material will cause burns to the skin, eyes and mucous membranes. Eye Contact: This product is severely irritating to the eyes and may cause irreversible damage including burns and blindness." (Emphasis added).
 {¶ 31} We again note that working with caustic chemicals is dangerous. However, construing the facts in favor of the plaintiffs, when employees are using corrosive chemicals, which require the use of chemical goggles, and they have not received adequate training, are carrying the chemical in open buckets, are not wearing the appropriate PPE, and are walking on hazardous surfaces, a jury could find that the employer knew harm was substantially certain. Based on the totality of the circumstances, the likelihood of injury could be found to rise above that required for negligence or recklessness. *Page 19 
 {¶ 32} Finally, to prove an employer intentional tort, the plaintiff must show that "the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." The Supreme Court has held that the employer is not required to specifically order the employee to engage in the dangerous process, procedure, or condition. In Hannah v. Dayton Power LightCo., 82 Ohio St.3d 482, 487, 1998-Ohio-408, 696 N.E.2d 1044, the employee was killed while performing a "vertical rescue." The court stated:
 However, under the third element of Fyffe, DP L did not have to expressly order the decedent to make the rescue. Instead, to overcome a motion for summary judgment, an opposing party can satisfy this requirement by presenting evidence that raises an inference that the employer, through its actions and policies, required the decedent to engage in that dangerous task. Here, former plant manager Fred Southworth testified that DP L expected the rescue squad to respond to an emergency, and to do so in a safe manner. Thus, when DP L sounded the alarm and summoned its own rescue squad into action, reasonable minds could differ as to whether DP L required the squad to make the rescue.
(Emphasis added). Similar facts are presented by this case. While testimony varied as to how often the pit was cleaned (from every six months to every two years), the record is clear that Gerry volunteered to work overtime during the plant shutdown. He was assigned to clean the pit with Terry Jacobs, Jamie Davis, and Dave Carmack. The task that day was to get the sludge out of the pit. Although Gerry was working on a voluntary basis on the day of his injury, the task of *Page 20 
cleaning the pit was assigned to him by MetoKote. Reasonable minds could differ as to whether MetoKote required Gerry to perform a dangerous process or procedure.
 {¶ 33} Having found genuine issues of material fact as to each element of the Fyffe test, the movant, MetoKote, is not entitled to summary judgment. The sole assignment of error is sustained, and the judgment of the Allen County Common Pleas Court is reversed. This cause is remanded for further proceedings.
Judgment reversed and cause remanded.
SHAW, P.J., and PRESTON, J., concur.
[1] According to one deponent, the "stairs" into the pit did not meet the OSHA definition of either "steps" or "ladder." Apparently, the stairs were at too steep of an angle to be considered steps, but they had too much of a slope and a handrail to prevent them from being classified as a ladder. Regardless of the technical definition, we will refer to the setup as "stairs."
[2] There is no discrepancy in the record that certain chemicals used at MetoKote, such as Parco, were previously manufactured in powder form. The record indicates that in the mid-1990's, the chemicals were produced in liquid form.
[3] While Triplett would not have personal knowledge of MetoKote's procedures as of the time of Gerry's injury, he had personal knowledge of the procedures used during his employment and his affidavit is proper in that regard. *Page 1