JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff, Hilah Chokan, as executrix of the estate of Donald Tafoya, deceased, appeals the trial court's denial of her motion to compel discovery and its granting summary judgment to defendant, Ford Motor Company ("Ford").
 {¶ 2} The underlying facts in this case are not in dispute. Chokan's decedent worked at Ford in the Cleveland Casting Plant ("the CCP") for nearly thirty years. In March 2001, decedent contracted Legionnaires' Disease while he worked at the CCP. In addition to decedent, three other workers at the CCP contracted Legionnaires' Disease between March and September 2001. One other person died from the disease, and the other two recovered.
 {¶ 3} Legionnaires' Disease is caused by a bacteria commonly present in water. When water contaminated by this bacteria is aerosolized and subsequently inhaled by a susceptible person, that person is likely to develop pneumonia and has a 20 percent chance of dying from the disease. As soon as Ford learned from the UAW representatives that decedent had contracted Legionnaires' Disease and that the exposure may have been at the CCP, Ford closed the CCP as a precautionary measure. It also notified the Cuyahoga County Board of Health and the Federal Centers for Disease Control (hereafter, "CDC"). OSHA also became involved. Ford hired a third-party contractor to investigate the outbreak, and as soon as the investigation was completed Ford implemented mitigation measures.
 {¶ 4} Decedent died eight days after becoming infected, and Chokan filed suit against Ford for workplace intentional tort. After extensive discovery, including more than twenty-five depositions, Chokan filed a motion to compel discovery of information regarding an alleged case of Legionnaires' Disease at another Ford plant in another state six years earlier. The trial court denied this motion, as well as Chokan's subsequent motion for reconsideration of the denial of this motion to compel.
 {¶ 5} Ford moved for summary judgment, which the court granted in an eleven-page opinion. Chokan timely appealed, stating three assignments of error. For clarity, we will first discuss the third assignment of error, which states:
III. THE TRIAL COURT ERRED AS A MATTER OF LAW IN GRANTING DEFENDANT-APPELLEE FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT AS TO THE CLAIMS OF PLAINTIFF-APPELLANT HILAH CHOKAN.
 {¶ 6} An appellate court reviews a summary judgment de novo.Hillyer v. State Farm Mut. Auto Ins. Co. (1996),131 Ohio App.3d 172, 175. Pursuant to Civ.R. 56(C), summary judgment may be granted under the following conditions: first, no genuine issue of material fact remains to be litigated; second, as a matter of law, the moving party is entitled to judgment; and, third, a review of the evidence shows that reasonable minds can reach only one conclusion, which, when that evidence is viewed most favorably to the party against whom the motion was made, is adverse to the nonmoving party. Temple v. Wean (1977),50 Ohio St.2d 317, 327.
 {¶ 7} Initially, the party seeking summary judgment has the burden of demonstrating the absence of any issue of material fact for trial. Celotex Corp. v. Catrett (1987), 477 U.S. 317, 330. Once the moving party has satisfied that initial burden, however, the nonmoving party then has a similar burden of showing that a genuine issue of fact remains for trial. Dresher v. Burt
(1996), 75 Ohio St.2d 280. If any doubts exist, the issue must be resolved in favor of the nonmoving party. Murphy v.Reynoldsburg (1992), 65 Ohio St.3d 356, 358-59.
 {¶ 8} Chokan's claim is for intentional tort on the part of Ford. The requirements for proving an intentional tort are quite stringent. As the Ohio Supreme Court held in Fyffe v. Jeno'sInc. (1991), 59 Ohio St.3d 115:
in order to establish "intent" for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledgeby the employer of the existence of a dangerous process,procedure, instrumentality or condition within its businessoperation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to theemployee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. (Van Fossen v. Babcock Wilcox Co. (1988),36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, modified as set forth above and explained.)
Id., paragraph one of the syllabus, emphasis added.
Employer's Knowledge of A Dangerous Condition
 {¶ 9} The first question is whether Ford had knowledge of a dangerous condition at CCP. In his report, plaintiff's expert, James Barbaree, opined there was a "substantial certainty that the Ford Motor Co. was aware of the risk." That level of awareness is not the same as actual knowledge, however, which is the required level a plaintiff must establish in order to recover against a defendant on an intentional tort claim.[1]
 {¶ 10} The mere existence of a dangerous condition alone is not sufficient to satisfy the first prong. Nor is knowledge of the mere possibility of a dangerous condition sufficient. "The employee bears the burden of proving by a preponderance of the evidence that the employer had actual knowledge of the exactdangers which ultimately caused the injury." Reed v. BFI WasteSystems (Oct. 23, 1995), Warren App. No. CA95-06-062, 1995 Ohio App. LEXIS 4642, at *4, citing Sanek v. Duracote Corp. (1989),43 Ohio St.3d 169, 172, emphasis added. See, also, Youngbird v.Whirlpool Corp. (1994), 99 Ohio App.3d 740, 746, and Conway v.Euclid Chemical Co., Cuyahoga App. No. 85384, 2005-Ohio-3843, ¶29, discretionary appeal denied at 107 Ohio St.3d 698,2005-Ohio-6763.
 {¶ 11} Ford does not deny that it was aware of thepossibility that Legionnaires' Disease existed in the CCP. Instead, Ford argues, "[t]here is no evidence that anyone at Ford had actual knowledge of this alleged dangerous condition at CCP before the March 2001 incident." Appellee's brief at 13, emphasis added.
 {¶ 12} It was established that Ford was aware of some risk of Legionnaires' Disease, because Ford had put steps in place to prevent an outbreak. The CDC report reflects that supervisors at Ford told the CDC that the supervisors "adhere to a regular program of disinfection and biocide application to the cooling powerhouse towers" to prevent Legionnaires' Disease. CDC Report at 5. Although the evidence shows Ford had knowledge of the possibility of a dangerous situation developing, there is no evidence that Ford had actual knowledge that a dangerous situation existed.
 {¶ 13} To support her claim that Ford had such knowledge, Choken points to Barbaree's expert report, in which he says:
It is my opinion that there is a substantial certainty that the Ford Motor Company was aware of the risk for Legionnaires' Disease at the plant. The fact that there is widespread awareness and knowledge and documents about the transmission ofLegionella from renown [sic] associations such as ASHRAE [The American Society of Heating, Refrigerating and Air-Conditioning Engineers], common knowledge about Legionnaires' Disease in the news, the existence of indoor air quality training aboutLegionella for industrial hygienists and safety supervisors, and historical records of previous outbreaks at automobile plants compels me to feel confident that officials at Ford Motor Company were aware of the risks.
 {¶ 14} First, we note that nothing in the record provides an evidentiary basis for Barbaree's conclusion that Ford was aware of anything more than a possible risk.
 {¶ 15} For example, although there is an ASHRAE document on transmission, this document indicates that samples "may not be predictive of the risk of transmission." The ASHRAE document does not support the expert's conclusion that Ford knew of the "exact dangers" at CCP. Nor does the record document any "news" from which to conclude common knowledge. Further, the record does not document the specific nature of "training about Legionella for industrial hygienists and safety supervisors." Nor does the record provide any "historical records of previous outbreaks at automobile plants." Barbaree's mere assertions are not enough. An expert's inferences must be drawn from facts in the record. Here, plaintiff's conclusions lack a factual foundation.
 {¶ 16} In fact, when questioned about the risk in his deposition, Barbaree testified it was his opinion "that Ford Motor Company didn't exist there without people at Ford Motor Company being aware that there is a possibility" of Legionella contamination in the water. Deposition of James Babaree, Feb. 22, 2005 (hereafter "Barbaree I") at 183, emphasis added. When asked "who at Ford was aware of this risk," he replied: "I don't know who was aware, but I would say they should have been aware." Barbaree I at 183, emphasis added. However, when asked whether there was "anyone aware of the risk of Legionnaires' Disease manifesting itself in a casting plant," the expert responded, "I don't know." Barbaree I at 187. Thus the expert's claim that Ford had actual knowledge of a known dangerous condition at CCP was solely an inference and this inference lacks an evidentiary basis in the record. Nor did Chokan provide any direct evidence of Ford's awareness.
 {¶ 17} As proof of Ford's awareness of the presence of the dangerous condition of Legionella, Barbaree observed that Ford had procedures in place to control Legionella in its cooling towers and water fountains. Contrary to his interpretation, however, this action indicated only that Ford took a proactive approach to protecting its employees from the possibility of a dangerous condition. Rather than demonstrating Ford's knowledge of the existence of Legionella in the CCP, Ford's actions to treat potential contamination serve to support Ford's claim that it was not aware of the specific hazard that caused Legionnaires' Disease in four of its employees. It is counterintuitive to believe that Ford would go to the trouble of treating some of the water and purposely excluding other water that it knew presented a substantial risk of infection.
 {¶ 18} The trial judge concluded that "the facts of Plaintiff Chokan's case simply do not rise to the level required by Fyffe
* * *." We agree. Barbaree's affidavit, report, and testimony fail to cite to facts in the record that would provide a sufficient basis to support his conclusion that Ford knew a dangerous situation existed at the CCP on the day its employee contracted Legionnaires' Disease. Thus as to whether there is a genuine issue for trial, Chokan has failed to offer sufficient proof of the first prong of the three-part test for intentional tort.
Knowledge that Harm Is Substantially Certain to Occur
 {¶ 19} Nor could Chokan satisfy the second prong of the test: that Ford knew the employee's exposure to this dangerous condition was substantially certain to result in harm to the employee. Substantial certainty of an injury requires more than mere knowledge of a dangerous situation; in other words, "exposure to hazardous or unusually dangerous conditions or processes is insufficient by itself to constitute a basis for bringing an intentional tort claim against an employer."Youngbird v. Whirlpool Corp. (1994), 99 Ohio App.3d 740, 745.
Proof of the employer's intent in the second category is by necessity a matter of circumstantial evidence and inferences drawn from alleged facts appearing in the depositions, affidavits and exhibits. Even with these facts construed most strongly in favor of the employee as required by Civ. R.56, the proof of the employer's intent must still be more than negligence or recklessness. Under the case-by-case review announced inKunkler, the affidavits, depositions, and exhibits must create an inference that the employer acted "despite a known threat that harm to an employee is substantially certain to occur." Kunklerv. Goodyear Tire Rubber Co., supra, at 139, 522 N.E.2d at 481. Comment b to Section 8A of 1 Restatement of the Law 2d, Torts (1965) 15, states:
"* * * If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness, as defined in § 500. As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence, as defined in § 282. All three have their important place in the law of torts, but the liability attached to them will differ." See, also, Prosser 
Keeton, Law of Torts (5 Ed. 1984) 35, Section 8.
Emminger v. Motion Savers, Inc. (1990), 60 Ohio App.3d 14,17.
 {¶ 20} Nowhere does the expert define the exact magnitude of "the risk for Legionnaires' Disease at the plant." A one percent risk, for example, is significantly different from an 80 percent risk. Although in his affidavit he asserted that Ford "knew of the hazard of Legionella * * * in water systems," he never clarified the degree of likelihood of this hazard. His general statement as to "the risks" does not equate with "knowledge of the employer of the existence of a dangerous * * * condition within its business operation." As the Ohio Supreme Court explained: "Mere knowledge and appreciation of a risk * * * falls short of substantial certainty and does not by itself establish intent."Mitchell v. Lawson Milk Co. (1988), 40 Ohio St.3d 190, 191, citations omitted.
 {¶ 21} The Second Appellate District has attempted to "provide guidance in making the legal distinction between the theory of `substantial certainty,' as inferred intent, and the negligence of the employer." The court explained: "The tort that we strive to shine some light upon is, in the application of the Restatement, somewhat less than the deliberate assault on an employee by an employer, but more than the grossly negligent or reckless act of an employer which occasions an injury to the employee." Jones v. Elder-Beerman Corp. (Sept. 21, 1988), Montgomery App. No. CA 10616, 1988 Ohio App. LEXIS 3831, at *7-8.
 {¶ 22} Nor is knowledge of a "significant risk" sufficient. The Tenth Appellate District explained:
* * * a showing of a significant risk of an explosion does not constitute a showing that an explosion was a substantial certainty. Karlshamns certainly could have been considered reckless in its failure to address the problems at its plant more aggressively. However, a reckless tort is not sufficient to allow recovery against one's employer.
Goodwin v. Karlshamns U.S.A., Inc. (1993),85 Ohio App.3d 240, 246.
 {¶ 23} In the case at bar, we have only an isolated risk that an employee who might be susceptible could contract Legionnaires' Disease from aerosolized water used in the manufacturing process. The only evidence Chokan supplies to support her contention that Ford knew that decedent was substantially certain to be injured by the Legionnaires' bacteria in aerosolized water in the CCP was the affidavit and report of her expert witness. But his report does not establish that employer had knowledge that harm to the employee was substantially certain. He averred:
Ford Motor Company knew of the hazard of Legionella and other bacteria in water systems. Not only did Ford have regular procedures in place dealing with cooling towers and drinking fountains, but Ford's industrial hygienist division had just six months earlier sent several of its industrial hygienists to a conference dealing exclusively with Legionnaires' Disease in which nationally known experts, including Ford's own expert, Janet Stout, Ph.D, spoke on the topic of preventing Legionnaires' Disease. Despite this, Ford had no regular program dealing with bacteria control in other water systems, including those that aerosolize water and will transmit Legionella in areas of the Ford plant implicated by the C.D.C. as a source of contamination.
Affidavit of James Barbaree, Ph.D, May 24, 2005. Saying that Ford's industrial hygienists division went to a seminar on the subject, which included preventing Legionnaires' Disease, is not enough. The record needs to report additionally what those attending heard, and the record does not provide the necessary evidence to support Barbaree's conclusions as to what Ford knew.
 {¶ 24} In his affidavit, Barbaree further states:
The identification of Legionella in multiple samples from the Ford plant demonstrates that the environment was conducive to the growth and survival of the bacterium.
Given the environment, the presence of systems that aerosolize water and the presence of employees who were susceptible to infection and Legionnaires' Disease, it is my opinion, with a reasonable degree of professional certainty, that: (a) the existence of legionella at the Ford Cleveland Casting Plant constituted a dangerous condition to susceptible employees at the plant; (b) there was a substantial certainty that there would be injury and/or death to Ford employees at some time in the future from Ford's failure to take any action whatsoever to control or minimize the Legionella hazard; and (c) despite this known dangerous condition, Ford subjected its workers to this environment without providing any warning to notify them of this condition.
 {¶ 25} An environment "conducive to the growth and survival of the bacterium," however, is not the same as an environment that is substantially certain to harm an employee. Knowledge of a bacterium in a few samples at Ford, does not demonstrate prior knowledge that harm to the employee is substantially certain.
 {¶ 26} In its published "Standards," the American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE) states: "Presence of the organism cannot be directly equated to the risk of infection. The bacterium is frequently present in water systems without being associated with known cases of the disease."
 {¶ 27} Moreover, Barbaree's deposition, testimony, and opinion significantly differ from his affidavit and report. In his report, the expert stated "there was a substantial certainty that there would be an injury and/or death to Ford employees at some time in the future from Ford's failure to take any action whatsoever to control or minimize the Legionella hazard * * *." And in his report Barbaree stated:
Under the circumstances, legionellosis cases were bound tohappen unless Ford Motor Company implemented preventative measures. It is obvious that Ford Motor Company did not have any preventative measures for the water systems other than the biocide treatment of some of its cooling towers.
Barbaree's Report at 3, emphasis added.
 {¶ 28} In his deposition, however, Barbaree described a lesser level of certainty. In fact, he backed away even from the statement that cases of Legionnaires' Disease were "bound to happen." He stated that "[i]f Legionella pneumophila is present there is a potentially dangerous situation." Deposition of James Barbaree, April 1, 2005 (hereafter, "Barbaree II") at 85, emphasis added. "Potentially dangerous" is a far cry from "bound to happen."
 {¶ 29} He also stated that although he could not predict how long it would take for one of the workers to be infected, "you have * * * a captive audience for contracting Legionnaires' Disease, and you have Legionella being dispersed. And so then you have the likelihood of the disease happening." Barbaree II at 32, emphasis added. He later noted that in the situation at the CCP, "[y]ou have people who are very susceptible. And then over a period of time, it's likely to happen." Barbaree II at 37, emphasis added. He again stated that in the situation at the CCP, "where you have people who are being exposed to Legionella[,] * * * I would say, over a period of time that this may really make a danger to some people." Barbaree II at 109. Vague knowledge that aerosolized water "may" cause or is even "likely" to cause Legionnaires' Disease to some unidentified susceptible person does not rise to the level of substantial certainty necessary to establish the element of intent.
 {¶ 30} Additionally, Barbaree fails to explain his basis for assuming that "employees who were susceptible" were working in the vicinity of the aerosolized water. He never claimed, moreover, that Ford actually knew in advance that certain workers would be susceptible to the disease. While this lack of knowledge may rise to the level of recklessness or negligence, it does not meet the stringent requirements for finding intent.
 {¶ 31} Further, Barbaree failed to show that Ford could or should have done anything to prevent the outbreak. When asked about a paper he had written, he stated he still agreed with his finding that "conflicting reports on the effectiveness of different compounds against legionella make choosing a treatment regimen difficult." Barbaree II at 79. He also agreed at his first deposition that "a case of legionellosis may occur even if every recommendation in the book is followed." Barbaree I at 97. Finally, he admitted that he did not know whether the outbreak at the CCP "was a temporary incident * * * or a long term problem." Barbaree II at 121. And he agreed that it is difficult "to know exactly where and when a Legionella pneumophila bloom is going to occur." Barbaree II at 98.
 {¶ 32} Barbaree also made the following admissions. Although guidelines exist for preventing and abating legionella, the CDC does not recommend routinely testing water for its presence until an actual case of Legionnaires' Disease is confirmed. Barbaree I at 99. In fact, he was not aware of any government regulations requiring treatment of cooling towers or other water systems or of any regulations available to Ford which would set forth an accepted testing and treatment program. Before this incident, he had never recommended testing or treatment of water in any industrial setting. Barbaree I at 178. He also did not know of any citations against Ford for legionella exposure, either before or after the incident.
 {¶ 33} As Ford pointed out, the ASHRAE Standards acknowledge[2] that
* * * routine culturing of samples from building water systems may not be predictive of the risk of transmission [of legionella] for the following reasons:
1. Presence of the organism cannot be directly equated to the risk of infection. The bacterium is frequently present in water systems without being associated with known cases of the disease.
2. Interpretation of the results of culturing water is confounded by the use of different bacteriological methods in various laboratories, by variable culture results among sites sampled within a water system, and by fluctuations in the concentration of (not intelligible) isolated from a single site.
3. The risk of illness following exposure to a given source is influenced by a number of factors other than the concentration of organisms in a sample. These factors include, but are not limited to, strain virulence, host susceptibility, and how efficiently the organisms are aerosolized to the particle size required to reach the deep portions of the human lung and remain viable.
4. Test results only represent the counts at the time the sample was collected. A negative result from such a sample is likely to lead to a false sense of security because any amplifier can quickly become heavily colonized if it suffers neglect.
ASHRAE Standards, Guideline 12-2000, at 13.
 {¶ 34} One of Ford's expert witnesses, David Fraser, M.D., noted that "there are no state and federal regulations regarding the maintenance of water systems in foundries and there hadn't been an outbreak of Legionnaires' disease in a foundry or indeed in the U.S. industry in which there had been publication in a peer review journal and epidemiologic implication of a source is there." Fraser Dep. at 77-78. This expert also pointed out that Ford had been treating the cooling towers [the source of aerosolized water] "with chlorine prior to the outbreak" of Legionnaires' Disease. Fraser Dep. at 79.
 {¶ 35} Failing to refute Ford's claim that it neither had actual knowledge of the existence of legionella in the water nor knew with substantial certainty that the decedent would become ill from exposure to legionella, Chokan did not raise a genuine issue of material fact in her claim for intentional tort against Ford.
 {¶ 36} Chokan claims, however, she could have proven this claim if Ford had produced the requested evidence in discovery. Chokan addresses this issue in her first and second assignments of error, which concern the denied discovery of an alleged case of Legionnaires' Disease in an automobile manufacturing plant in another state several years prior to decedent's incident. They state:
I. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING PLAINTIFF-APPELLANT HILAH CHOKAN'S MOTION TO COMPEL DISCOVERY.
II. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING PLAINTIFF-APPELLANT HILAH CHOKAN'S MOTION FOR RECONSIDERATION OF THE ORDER DENYING PLAINTIFF-APPELLANT'S MOTION TO COMPEL DISCOVERY.
 {¶ 37} Chokan asserts that but for the trial court's denial of her motion to compel, she would have presented sufficient evidence contradicting Ford's claims to create an issue of material fact for the jury. We disagree. Chokan requested information concerning an alleged outbreak of Legionnaires' Disease at a Ford plant five years earlier. She claimed she required this discovery to maintain the first prong of theFyffe test for intentional tort: that the employer had knowledge of the dangerous situation. Even with this information, however, Chokan could not meet the high standard required by the test for an employer's intentional tort. Even assuming that the requested discovery would have confirmed an instance of Legionnaires' Disease at another automobile manufacturing plant in another state several years earlier and even if the plants were shown to be sufficiently similar to alert the employer to a problem at CCP, Chokan fails to show that Ford was substantially certain that decedent would contract Legionnaires' Disease. Evidence of an outbreak years earlier is insufficient to show that Ford knew with substantial certainty, first, that the procedures it had in place were inadequate, and second, that the existence of legionella in the CCP was substantially certain to result in harm to decedent.
 {¶ 38} Because the requested discovery would not have aided Chokan's case, the trial court did not err in denying it, and the trial court did not err, therefore, in granting Ford's motion for summary judgment.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Celebrezze, Jr., P.J., concurs.
Gallagher, J., concurs in judgment only.
[1] Barbaree has confused what must be demonstrated with "substantial certainty." He has attributed this certainty to hisinference as to Ford's awareness, whereas the Fyffe test requires there be substantial certainty of harm and actualknowledge of that certainty.
[2] Plaintiff's expert described ASHRAE as a "renown[ed]" association that has produced documents about the transmission ofLegionella.