OPINION
{¶ 1} Plaintiffs-appellants, Anthony Quinn and Susan Vance, appeal the decision of the Butler County Court of Common Pleas granting summary judgment to defendant-appellee, Akers Packaging Service, Inc., in an employer intentional tort action.[1]
 {¶ 2} Akers manufactures corrugated containers. In its manufacturing process, Akers uses a "slitter" machine which scores and cuts cardboard to required specifications. Appellant was initially hired as a helper through a temporary employment agency. He was hired as a full time employee in June 2001. On July 19, 2001, appellant became a slitter operator.
 {¶ 3} A slitter operator feeds corrugated sheets through the front of the machine. The corrugated sheets are scored, cut, and conveyed to a "take-off table" that sits on the exit side of the machine (also called the "take-off" side). The take-off table is not attached to the slitter and is movable. In fact, the table can be moved far enough away from the slitter so that there is a space between the table and the take-off side where one could walk through. At the time of the accident, the take-off side of the slitter had no guard and thus had exposed rollers, knives, and scorers.
 {¶ 4} Once he obtains an order for a corrugation job, a slitter operator (1) brings the corrugated sheets to the front of the machine; (2) goes to the take-off side of the machine and sets the knives and scorers according to the appropriate job specifications while the machine is off; (3) turns on the machine and runs a test piece; (4) turns the machine off, goes to the take-off side, grabs the test piece from the take-off table, and measures the piece to determine whether it is correct; (5) if the test piece meets the job specifications, runs the corrugated sheets through the front of the machine until the job is complete; (6) once the job is complete, turns the machine off, goes to the take-off side, and stacks the finished product on a cart.
 {¶ 5} The accident occurred on March 26, 2002. That day, after appellant ran a test batch, he realized that some of the test pieces were incorrectly cut. Appellant stacked the properly cut pieces on a take-off cart. He then grabbed "the bad stuff," walked between the take-off table and the take-off side while the machine was on, and put the "bad stuff" onto the "scrap cart". As appellant was walking back through the area between the table and the take-off side, with the machine still running, his shirt got caught on a perforated scorer. As appellant tried to push himself away, his left arm was pulled into the machine. Appellant suffered serious injuries as a result of the accident. In his deposition, appellant admitted that the accident took place when he went to the take-off side without first turning the machine off, that he did not need the machine to be on to perform his task, and that he could have turned it off.
 {¶ 6} The Vances filed a complaint against Akers alleging, inter alia, a claim of intentional tort. Akers moved for summary judgment. On April 20, 2006, the trial court granted summary judgment in favor of Akers. The trial court found that pursuant to Fyffe v. Jeno's, Inc. (1991),59 Ohio St.3d 115, (1) the slitter was a dangerous machine; (2) although Akers had an appreciation of the danger in operating the machine, the evidence did not indicate it had the requisite knowledge that injury was substantially certain to occur; and (3) Akers never required appellant to walk around the back of the slitter while it was still operating and in fact took every opportunity to train individuals not to perform such actions. The trial court concluded that "[w]hile the slitter was a dangerous instrumentality, reasonable minds could come to but one conclusion — Akers did not have knowledge that harm was substantially certain to occur."
 {¶ 7} This appeal follows in which the Vances raise four assignments of error. For clarity, we will consider them out of order.
 {¶ 8} Assignment of Error No. 1:
 {¶ 9} "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST THE VANCES WHEN GENUINE ISSUES OF MATERIAL FACT EXIST."
 {¶ 10} Assignment of Error No. 3:
 {¶ 11} "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST THE VANCES ON THEIR INTENTIONAL TORT CLAIM WHEN THE VANCES PUT FORTH SUFFICIENT EVIDENCE TO MEET THE THREE PRONGS OF THE FYFFE TEST."
 {¶ 12} Appellant argues that it was error for the trial court to grant summary judgment to Akers under Fyffe because there were genuine issues of material fact as to whether Akers (1) knew, with substantial certainty, that an employee would be injured while operating the unguarded slitter machine, and (2) required its employees to continue to perform tasks on the unguarded slitter machine. In support of his argument, appellant points to the facts that (1) Akers personnel all agreed they knew that an injury would occur if someone were to get too close to the take-off side of the machine; (2) employees were observed by other employees and supervisors working on the take-off side of the machine when it was on without reprisals from supervisors or management; (3) in fact, Akers trained its employees to be on the takeoff side of the machine when it was on; and (4) Akers knew about a prior similar accident on a slitter machine.
 {¶ 13} Summary judgment is appropriate under Civ.R. 56(C) when (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) construing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to only one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. Harless v.Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 66. Our standard of review on summary judgment is de novo. Jones v. Shelly Co. (1995),106 Ohio App.3d 440, 445.
 {¶ 14} An employee injured at work may institute a tort action against his employer when the employer's conduct constitutes an intentional tort. Davis v. AK Steel, Butler App. No. CA2005-07-183, 2006-Ohio-596, ¶ 6. In this context, an intentional tort has been defined as "an act committed with the intent to injure another, or committed with the belief that such injury was substantially certain to occur." Hannah v.Dayton Power Light, 82 Ohio St.3d 482, 484, 1998-Ohio-408.
 {¶ 15} To prevail in an action for intentional tort against an employer, the employee must show: "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Fyffe, 59 Ohio St.3d at paragraph one of the syllabus.
 {¶ 16} Cases involving workplace intentional torts must be judged on the totality of the circumstances surrounding each accident.Davis, Butler App. No. CA2005-07-183, at ¶ 9. An employer intentional tort claim requires proof beyond that required to establish negligence or recklessness. Mere knowledge and appreciation of a risk, something short of substantial certainty, is not intent; the intentional tort cause of action is limited to egregious cases. Sloan v. Capitol Mfg.Co., Madison App. No. CA2004-04-009, 2005-Ohio-327, ¶ 10, citingSanek v. Duracote Corp. (1989), 43 Ohio St.3d 169. Proof of the employer's intent "is by necessity a matter of circumstantial evidence and inferences drawn from alleged facts appearing in the depositions, affidavits and exhibits. Even with these facts construed most strongly in favor of the employee * * * the proof of the employer's intent must still be more than negligence or recklessness." Emminger v. MotionSavers, Inc. (1990), 60 Ohio App.3d 14, 17.
 {¶ 17} In establishing whether an employer knew that an injury was substantially certain to occur, prior accidents are probative.Taulbee v. Adience, Inc., BMI Div. (1997), 120
 {¶ 18} Appellant testified that he received general safety training via videos and meetings every few months, and that he was trained to operate the slitter by the then-operator of the machine. The record shows he watched a safety video which included slitters about one month before he became a slitter operator. Appellant testified that (1) he knew that if he touched the unguarded knives and scorers on the take-off side while the machine was on, he would get hurt; in fact, he did not need training to know that; (2) he was probably trained to turn the machine off before going to the take-off side, but could not remember one way or the other; (3) he would sometimes leave the machine on while taking the product or scrap pieces out; (4) although he could measure a test piece on the take-off side with the machine off, 90 per cent of the time he performed the task while the machine was on; (5) people saw him perform that task that way all the time; (6) he saw others remove scrap pieces without turning the machine off; (7) "probably everybody on second shift" saw him working on the take-off side when the machine was on; and (8) he was never instructed not to turn the machine off before going to the take-off side.
 {¶ 19} Appellant also testified that he was trained to clean the slitter on the take-off side with the machine running and that everybody, including his foreman, Richard Young, saw him do that. Appellant explained that he would turn the machine off, move the knives on one side, turn the machine back on, and clean the cylinders with an emery cloth with the machine running. Finally, appellant testified that Vicki Spaulding, the human resources manager, told him at the hospital that an employee once got his rear end cut by a slitter.
 {¶ 20} With regard to that prior accident, the evidence shows that many employees had heard that a long time ago, an employee was hurt by a slitter. Of the employees deposed, most did not know any of the details and circumstances of the accident other than it happened long ago; two employees knew that the employee hurt his rear end while being on the take-off side while the slitter was on. One of those two employees was John Roberts who testified that the accident happened in the 1970s. Roberts stated he had heard that the employee had walked to the take-off side with the machine on and was bending over to pick up scrap when he backed into the blades. According to Roberts, the employee went to the hospital and was back without losing any time at work. None of the deposed employees had first-hand knowledge of the accident.
 {¶ 21} The evidence shows that Akers has no records of the accident. Spaulding found out about the prior accident after appellant's accident. David Wilson, a plant manager, had heard about the accident but did not know anything about it, and found no records or paperwork verifying it had in fact occurred. Young, appellant's former supervisor, was not aware of the prior accident.
 {¶ 22} Richard Johnson, a current slitter operator, testified that Akers shows safety training videos, and that he was trained and instructed to not "walk behind the [slitter] because your shirt might get caught in there. Don't reach across the table when the machine is running and try to pick up stuff. So it was basically keep away from it, from the back side of it. And shut it off." Johnson testified he was warned to stay away from the take-off side when the machine was on. He also testified that he has never walked on the take-off side when the machine is on, never walks between the take-off table and the take-off side, and would never clean the slitter when it is running. He had, however, seen other employees do those things before appellant's accident, and had seen appellant clean the slitter in that manner once or twice. He did not remember seeing supervisors when he saw employees walking on the take-off side of the machine.
 {¶ 23} William Stull was a slitter operator for 19 years at Akers. Stull testified that he never walked on the take-off side while the machine was on and that he has never seen an employee do that. He also testified that he never cleaned the slitter when it was on and never instructed anyone to do so. Finally, he testified that you turn the machine off first before removing scrap pieces.
 {¶ 24} John Roberts, a former employee, worked on the slitter for about a month. Nonetheless, he was trained to shut it off to remove scrap pieces and any time he had to be on the take-off side. Roberts testified that he had never walked between the take-off table and the take-off side when the machine was on, but that he had seen employees do that. If he ever was on the take-off side while the machine was on, the take-off table was between him and the machine. Finally, Roberts did not remember seeing William Stull or Dennis Hamilton walk on the take-off side when the machine was on.
 {¶ 25} Dennis Hamilton, a former employee, was a slitter operator for six months. Hamilton testified he was trained to keep the take-off table between him and the machine whenever he was on the take-off side. He testified that on occasion, he would be between the table and the take-off side to set or reset the scorers and knives or to remove scrap pieces. However, the machine would be off. Just like appellant, Hamilton cleaned the cylinders weekly with the machine running. Hamilton stated that his then-supervisor "had a chance to observe" the way Hamilton cleaned the cylinders. With the exception of cleaning the machine, Hamilton did not recall seeing employees walk between the table and the takeoff side while the machine was on. Finally, in an affidavit, Hamilton stated that he would measure the test piece on the take-off side with the machine running. However, he specified in his deposition that whenever he performed that task, the table would be between him and the machine.
 {¶ 26} David Wilson was the plant manager at the time of appellant's accident. Asked if an employee could be on the take-off side when the machine was on, Wilson distinguished between being on the take-off side at a distance that could result in the person being pulled into the machine, which was unsafe, and being at a safe distance from the machine, such as for example four to five feet away.
 {¶ 27} Wilson testified that (1) he has never seen employees on the take-off side within an unsafe distance of the machine while it was working. If he had, he would have told the employee to move away and taken disciplinary action; (2) he has never seen employees between the take-off table and the take-off side when the machine was on; (3) employees are trained by the plant's quality manager/safety coordinator, their supervisor, and the former slitter operator; (4) appellant's method of cleaning the cylinders was improper and should never have been allowed; (5) he has never observed that method; (6) he did not know employees were cleaning the cylinders and walking on the take-off side at an unsafe distance when the machine was on; and (7) he was surprised to find out how often, according to appellant's deposition, appellant was on the take-off side when the machine was on. Wilson testified that the lack of guards on the scorers before appellant's accident was a potential danger only if employees violated safety procedures. According to Wilson, an unsafe act by an employee failing to follow procedural controls is a contributor to any accident.
 {¶ 28} Richard Young was appellant's supervisor. Young testified that (1) Akers had monthly safety meetings; (2) he would routinely distribute safety flyers to employees, have them read them, and occasionally have a quiz; and (3) appellant went through safety orientation after he was hired as a full time employee. With regard to the slitter, Young testified that (1) it must be turned off before a test piece is measured on the take-off side and removed; (2) it was mandatory to turn it off before you went to the take-of side; (3) an employee was in violation of the safety rules if he left the machine on while going to the takeoff side; and (4) an employee could be between the take-off table and the take-off side to set up the knives, remove scrap pieces, or remove test and finished pieces as long as the machine was off.
 {¶ 29} Young testified that with regard to the slitter, he told appellant to "always shut the machine off before you make adjustments, clean out your scrap, take off the stock on the [take-off side], and we went over that in safety films too when he was hired[.]" Young also testified that (1) he never saw employees, including appellant, on the take-off side when the machine was on; (2) he was surprised to find out that appellant went to the take-off side with the machine running and cleaned the cylinders with the machine on; and (3) he never trained appellant to clean the cylinders that way.
 {¶ 30} Construing the foregoing evidence most strongly in favor of appellant, we find that reasonable minds can only come to the conclusion that Akers did not know that by operating the slitter, harm to appellant would be a substantial certainty. While Akers certainly knew that an injury could occur if someone were to get too close to the take-off side while the machine was on, this was only mere knowledge and appreciation of the risk, something short of substantial certainty. SeeSanek, 43 Ohio St.3d 169.
 {¶ 31} The evidence shows that although employees were trained to turn off the machine before going to the take-off side, some employees did not. Safety meetings and videos as well as safety brochures were provided by Akers to its employees. Both Wilson and Young testified that they had never seen employees or appellant being on the take-off side when the machine was on, and that they were surprised to find out that employees and appellant did in fact do that. "An employer cannot be held to know that a dangerous condition exists and that harm is substantially certain to occur when he has taken measures that would have prevented the injury altogether had they been followed. * * * [W]hen safety devices or rules are available but are ignored by employees, the requisite knowledge of the employer is not established." Davis, Butler App. No. CA2005-07-183, ¶ 11, quoting Robinson v. Icarus Indus. Constr. Painting Co., 145 Ohio App.3d 256, 262, 2001-Ohio-2207.
 {¶ 32} Appellant strongly emphasizes the fact that he was specifically trained to clean the cylinders of the slitter while the machine was on. However, appellant was not injured while cleaning the machine. Rather, appellant was injured as he was walking between the take-off table and the take-off side when the machine was running, even though he did not need the machine to be on to perform that task and in fact could have turned the machine off. In addition, appellant testified that no one from Akers ever instructed him not to turn the machine off before walking behind the take-off side.
 {¶ 33} With regard to the prior accident, we find that it did not put Akers on notice that an injury such as the one sustained by appellant was substantially certain to occur. The prior accident apparently occurred at least twenty years before appellant's accident, there were no records of it, and no other incident occurred between that accident and appellant's accident. In addition, the circumstances were different. The prior accident involved an employee actually backing into the machine whereas appellant was pulled into the slitter when a piece of his clothing got caught as he walked between the take-off table and the take-off side.
 {¶ 34} Appellant argues that the testimony of his expert witness, Jeffrey C. Bookwalter, supports his position that his injury was substantially certain to occur. Bookwalter testified that it was his "[basic] opinion to a reasonable degree of professional certainty that [appellant] was substantially certain to become injured in his position as a slitter operator at Akers * * * while operating the * * * Slitter." Bookwalter defined "substantial certainty" as "in the normal course of operation, * * * eventually you're going to get * * * injured on the machine you're assigned to based on your operation, your training, and your supervision[.]" Bookwalter stated that many factors contributed to the accident. Bookwalter testified that the lack of guarding on the take-off side of the slitter, and the fact that appellant was both improperly trained and inadequately supervised, which resulted in appellant going on a weekly basis to the take-off side of the slitter while the machine was running, led to conditions that allowed the accident to occur. Asked whether Akers knew that injury to appellant was substantially certain to occur, Bookwalter replied:
 {¶ 35} "So you get all those things together and * * * [t]hose things come together, and I think those combination of events form a substantial certainty for an accident like this to occur. * * * I think when we get an inadvertent contact you're going to get an injury on this machine. * * * The situation for the inadvertent contact for him to be there was created by all the combination of events that we have just described.
 {¶ 36} "I think if they'd done their job right, they'd have known what it would have done, it could have occurred and should occur, and eventually would occur. But I think there were downfalls in the area of plant equipment, in terms of guarding, there were downfalls in terms of training, there were downfalls in the areas of supervision that had any one of those items been rectified, we wouldn't have had this accident."
 {¶ 37} An expert's opinion, however, "does not establish that element as a legal conclusion." Davis, Butler App. No. CA2005-07-183, ¶ 12. Rather, the opinion "must create a genuine issue of material fact from a legal standpoint." Id. Despite Bookwalter's opinion to the contrary, the facts of this case do not demonstrate a substantial certainty that the accident would occur. Even if a guard should have been in place on the take-off side of the slitter, "the failure to provide available safety devices may constitute negligence or recklessness, but does not constitute substantial certainty." Id. Likewise, even if appellant's training and supervision were inadequate, "it would constitute negligence or recklessness at best, and would not rise to the level of substantial certainty." Id.
 {¶ 38} Appellant also cites Brookover, Washington App. No. 00CA49, for the proposition that an employer has actual knowledge that an injury is substantially certain to occur when the employer knows the employees are working near an unguarded danger area. In that case, the employee fell over a "stop bar" and his hand became entangled in the rollers of a calendar machine. The Fourth Appellate District found that "[t]he record contains ample evidence that [the employer] knew that unguarded, inrunning nip points would be substantially certain to cause injury if an employee came in contact with the unguarded, inrunning nip point. The record also contains ample evidence of the extremely slippery floor around the machine. Because [the employer] knew that [the employee], to adjust the air hose, would work near the unguarded, inrunning nip point while walking on a slippery floor, we agree with the trial court's conclusion that an injury to [the employee] was a substantial certainty." Id. at ¶ 129. Upon reviewing the lengthy facts of this case, we find that the facts are distinguishable from the case at bar, and that the holding in Brookover does not apply here.
 {¶ 39} Weighing the evidence in favor of appellant, we find that reasonable minds could not conclude that Akers knew that the harm that befell appellant was substantially certain to occur. Therefore, appellant has not met the requirements of the second prong ofFyffe, necessary to demonstrate intent in an employer intentional tort case. Having failed in this regard, appellant's claim fails as a matter of law and we need not consider the evidence related to the third prong of the Fyffe test. See Davis, Butler App. No. CA2005-07-183, andSloan, Madison App. No. CA2004-04-009. The Vances' first and third assignments of error are overruled. Because we have found that appellant failed to meet the second prong of Fyffe, we need not consider Akers' argument that the trial court erred in finding that the firstFyffe prong was met. See id.
 {¶ 40} Assignment of Error No. 2:
 {¶ 41} "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST THE VANCES BY FAILING TO WEIGH THE EVIDENCE IN A LIGHT MOST FAVORABLE TO THE VANCES, THE NON-MOVING PARTY."
 {¶ 42} Appellant argues that the trial court failed to construe the evidence in his favor, namely, (1) that a prior similar accident occurred on a slitter machine, which was common knowledge within the plant and known by Vicky Spaulding, Akers human resources manager, and (2) the fact that although Akers claimed to have rules and policies forbidding slitter operators from being behind the slitter when it was on, Akers clearly failed to enforce the policies and to properly train its employees on those policies, as slitter operators were observed by supervisors and other employees being behind the machine while it was on, yet were never disciplined.
 {¶ 43} In setting forth its standard of review on a motion for summary judgment, the trial court twice expressly stated that summary judgment can only be granted when it appears from the evidence, "construed moststrongly in favor of the non-moving party," that there are no genuine issue of material fact; that reasonable minds can only come to one conclusion which is adverse to the nonmoving party; and that as a matter of law the moving party is entitled to judgment. (Emphasis added.) After reviewing the evidence presented by the parties in favor and against summary judgment, including the prior accident and Akers' alleged failure to train and properly supervise its employees, the trial court, "[c]onstruing the facts most strongly in favor of the non-movingparty[,] [found] that no questions of material fact remain[ed] as to the three elements of Fyffe" (Emphasis added.)
 {¶ 44} The primary function of a trial court in reviewing a motion for summary judgment is to determine whether triable issues of fact exist, that is, whether there is sufficient evidence to support the essential elements of the non-moving party's claim. See Napier v. Brown (1985),24 Ohio App.3d 12. Only if a court finds that there are no facts upon which reasonable minds can come to more than one conclusion may summary judgment be rendered. Upon reviewing the trial court's decision in light of the record, we find there is no evidence, notwithstanding appellant's assertion to the contrary, that the trial court failed to weigh the evidence most strongly in his favor, or that it failed to follow or apply the proper standard of review. The Vances' second assignment of error is overruled.
 {¶ 45} Assignment of Error No. 4:
 {¶ 46} "THE TRIAL COURT ERRED IN FAILING TO CONSIDER THE AFFIDAVIT OF SHIRLEY KEISTER IN GRANTING SUMMARY JUDGMENT AGAINST THE VANCES."
 {¶ 47} The record shows that the Vances filed the affidavit of Shirley Keister, a former Akers employee and slitter operator, about a month after Akers moved for summary judgment. Akers moved to strike the affidavit on the ground that since Keister had failed twice to appear for scheduled depositions, it would be unfair and improper to allow the Vances to submit her affidavit in support of their arguments against Akers' motion for summary judgment. In its decision granting summary judgment to Akers, the trial court stated: "[Akers] filed a motion to strike the affidavit of Shirley Keister who failed to appear after being subpoenaed twice for deposition. The Court having already decided the issues in favor of * * * Akers finds the motion moot."
 {¶ 48} Appellant argues that the trial court failed to consider Keister's affidavit before granting summary judgment to Akers. Appellant argues, in essence, that by finding Akers' motion to strike to be moot, the trial court necessarily failed to consider the affidavit. We disagree. Just because the trial court declined to address Akers' motion to strike does not mean that the court did not consider the affidavit before granting summary judgment to Akers. The affidavit was filed five months before the trial court's decision. The trial court therefore had the opportunity to review and consider the affidavit. There is no evidence in the record to support appellant's assertion that the trial court did not consider the affidavit. Error will not be presumed. It must affirmatively appear on the record. See Wallace v. Feador (Nov. 3, 1983), Cuyahoga App. No. 46662; see, also, Murphy v. Reynoldsburg,65 Ohio St.3d 356, 1992-Ohio-95 (trial court failed to conduct even a cursory review of the evidence presented on a motion for summary judgment, informed the parties at the beginning of a hearing on a summary judgment motion that it had not read any of the evidence submitted with regard to the motion, and instead made its ruling entirely based upon oral arguments presented by the parties). The Vances' fourth assignment of error is overruled.
 {¶ 49} Judgment affirmed.
POWELL, P.J., and BRESSLER, J., concur.
[1] Susan Vance's claims are for consortium. Throughout the opinion, Anthony Quinn Vance will be referred as "appellant," as he is the primary plaintiff. When necessary, Anthony Quinn and Susan Vance will be referred as "the Vances".