OPINION *Page 2 
{¶ 1} Plaintiffs-appellants, Timothy and Karen Gibson, appeal the decision of the Butler County Court of Common Pleas granting summary judgment to defendant-appellee, Precision Strip, Inc., in an employer intentional tort action.[1]
 {¶ 2} Precision is a metal processing company which uses a coilmaster wrapper machine ("CoilMaster") in the wrap bay area of its Middletown, Ohio facility. The CoilMaster shrink-wraps steel coils by applying stretch film around the coils and through the coils' bore as the coils rotate on blocker rolls. Once wrapped, coils are dirt free and waterproof. The CoilMaster was installed at the Middletown facility in late 1997 and early 1998. This particular CoilMaster is unique in that it was designed to traverse (move laterally) to three different stations (stations 1, 2, and 3) to wrap coils. No other CoilMaster machines are owned by Precision.
 {¶ 3} The CoilMaster has two opposing arms in the shape of a "C" (the "C-arms") that move laterally along a track and stop at one of the three positions to wrap steel coils. When a steel coil is ready to be wrapped, the C-arms lower down to the center of the coil and close through the bore of the coil to form an oval "O" shape around the coil. As the coil then rotates, a shuttle containing stretch film travels multiple times around the "O" shape, wrapping the coil in plastic. Before the coils are wrapped, inside diameter rings ("ID rings") are manually inserted by the CoilMaster operator on either side of the coil to ensure that the coil edges do not cut the plastic wrap during the wrapping process. The ID rings are inserted before the C-arms connect through the bore of the coil. The CoilMaster does not automatically move from one position to the next position(s); rather, the operator sends the *Page 3 
CoilMaster to a next position by pushing a button each time.
 {¶ 4} Appellant was hired through a temporary employment agency. He started working at Precision on October 30, 2004 (a Saturday) by attending a half-day safety and orientation meeting, which included testing and viewing safety videotapes. The following Monday, appellant began working in the wrap bay area, where he was trained to operate the CoilMaster. Appellant spent his first week running the CoilMaster, Monday through Thursday, from 5 a.m. to 5 p.m. Appellant worked in a different part of the facility the second week.
 {¶ 5} The accident happened in the morning of November 15, 2004 (the Monday of appellant's third week at Precision) as appellant was preparing a steel coil for wrapping. Before preparing the coil, appellant started the CoilMaster so that the machine was on and the C-arms were traversing from one position to the next position. As the CoilMaster and its C-arms were traversing in the direction of the coil to be wrapped, appellant inserted ID rings on the coil. As he walked away, he noticed in the corner of his eye that the ID rings had fallen out. Appellant walked back to the coil. As he was re-inserting the ID rings, one of the C-arms came behind him, and pinned him and pressed him against the coil. Appellant suffered severe injuries as a result of the accident. Appellant admitted that as he was re-inserting the ID rings, the traversing CoilMaster was beeping; however, appellant never looked to see exactly where the CoilMaster and its C-arms were. Appellant knew that by starting the machine, the C-arms would be traveling, heading his way as he was dealing with the ID rings. Appellant admitted he could have stopped the machine before re-inserting the ID rings but that doing so never crossed his mind. Appellant also testified that on occasions, he inserted ID rings before starting the machine.
 {¶ 6} The Gibsons filed a complaint alleging several claims against several parties, including an intentional tort claim against Precision. Precision moved for summary judgment. *Page 4 
On August 6, 2007, the trial court granted summary judgment in favor of Precision. The trial court found that appellant had failed to prove the three elements of an employer intentional tort under Fyffe v.Jeno's, Inc. (1991), 59 Ohio St.3d 115.
 {¶ 7} This appeal follows in which the Gibsons raise the following assignment of error:
 {¶ 8} "THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT-APPELLEE."
 {¶ 9} Appellant argues it was error for the trial court to grant summary judgment to Precision under Fyffe because there were genuine issues of material fact as to whether Precision (1) knew that operating the CoilMaster was dangerous due to the unguarded pinch point hazard between the coil to be wrapped and the traversing C-arms; (2) knew, with substantial certainty, that appellant would be injured while operating the unguarded CoilMaster; and (3) required appellant to continue to operate the unguarded CoilMaster. In support of his argument, appellant points to the existence of a Job Safety Analysis ("JSA") governing the CoilMaster, the OSHA citation following appellant's accident, and the facts that (1) Precision personnel all agreed an employee should not be in front of the CoilMaster and its C-arms as they are traversing from one position to the next; (2) yet, Precision trained its employees to be in front of the traversing machine when preparing the coil by training them to turn on the machine before preparing the coil and inserting the ID rings; and (3) Precision knew about a prior similar accident on the CoilMaster.
 {¶ 10} Summary judgment is appropriate under Civ. R. 56(C) when (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) construing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to only one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. WelcoIndus., Inc. v. Applied *Page 5 Cos., 67 Ohio St.3d 344, 346, 1993-Ohio-191. Our standard of review on summary judgment is de novo. Jones v. Shelly Co. (1995),106 Ohio App.3d 440, 445.
 {¶ 11} To prevail in an action for intentional tort[2] against an employer, the employee must prove all three prongs of the Fyffe test, to wit: "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Fyffe, 59 Ohio St.3d 115, paragraph one of the syllabus; Luce v. Security Fence Group, Inc., Warren App. Nos. CA2007-06-080,-081, 2008-Ohio-3591.
 {¶ 12} Cases involving workplace intentional torts must be judged on the totality of the circumstances surrounding each accident. Gibson v.Drainage Prods., Inc., 95 Ohio St.3d 171, 2002-Ohio-2008, ¶ 27. The focus of an intentional tort action is on the knowledge of the employer regarding the risk of injury. The plaintiff has the burden of proving that the employer had "actual knowledge of the exact dangers which ultimately caused injury." Sanek v. Duracote Corp. (1989),43 Ohio St.3d 169, 172. "An employer intentional tort claim requires proof beyond that required to establish negligence or recklessness. Mere knowledge and appreciation of a risk, something short of substantial certainty, is not intent; the intentional tort cause of action is limited to egregious cases." Vance v. Akers Packaging Serv., Inc., Butler App. No. CA2006-05-105, 2006-Ohio-7032, ¶ 16; Sanek. Even with facts construed most strongly in favor of the employee, the proof of the employer's intent must still *Page 6 
be more than negligence or recklessness. Emminger v. Motion Savers,Inc. (1990), 60 Ohio App.3d 14, 17.
 {¶ 13} In establishing whether an employer knew that an injury was substantially certain to occur, prior accidents are probative.Taulbee v. Adience, Inc., BMI Div. (1997), 120 Ohio App.3d 11, 20. Courts should focus not only on the existence of prior similar accidents, but also "on the employer's knowledge of the degree of risk involved." Id. at 21. In showing that the employer knew that injury to the employee was a substantial certainty, "[w]hat a reasonable person should have known is not sufficient." Vance, 2006-Ohio-7032, ¶ 17. Rather, the employee must show that the employer possessed "actual knowledge" that injury to the employee was a substantial certainty. Id.;Sanek, 43 Ohio St.3d at 172.
 {¶ 14} Before Precision, appellant had never operated a CoilMaster. However, appellant had 26 years of experience in the manufacturing environment and understood the dangers and hazards associated with machinery and what pinch points are. Appellant testified that on his first day of work, Jeremy Gillis trained him for about three hours on how to run the CoilMaster. The training was hands-on; appellant was not shown any manuals or the CoilMaster JSA and did not remember seeing manuals for the CoilMaster. Later that day, Gillis came back to check on him. Appellant was told that if he had any questions or problems, he could ask any of the employees in the wrap bay area to help him. Appellant testified he asked for help on several occasions. In fact, when he had problems with the stretch film or the shuttle, "instead of doing something, [he] would always go find somebody to come over and they would show me what to do." There were no productivity goals or obligations but appellant was told to keep the machine going.
 {¶ 15} Appellant testified he was trained by Gillis to prepare a coil for wrapping when the CoilMaster was traversing to reach the position of the coil, and to insert the ID rings after starting the machine (so that it would traverse from one position to the next), but before the C-C-arms *Page 7 
were connected in the coil's bore. Appellant observed Gillis insert the ID rings after he had started the CoilMaster to traverse from one position to the next; but did not remember if Gillis ever inserted the ID rings before starting the machine. Appellant testified that (1) other employees saw him insert the ID rings while the CoilMaster was traversing; (2) he was never instructed not to do it in that manner or told he was operating the CoilMaster the wrong way; (3) he did not know if management employees ever saw him insert ID rings in front of the traversing CoilMaster; (4) Charles "Butch" Swartz helped him with the CoilMaster during his first week and showed him the same things that Gillis had showed him; and (5) he did not remember Swartz telling him not to stand between the coil and the traversing CoilMaster. Appellant testified he had enough time to "start the machine and then walk in front of it and insert the ID ring in the coil, and then get back out for the machine to complete its task." Appellant stated that when traversing, the CoilMaster was very slow and emitted a beeping sound.
 {¶ 16} Appellant admitted that on a few occasions, he prepared coils before starting the CoilMaster; he was never told it was improper to prepare coils before starting the machine; and on the day of the accident, he could have stopped the machine (and thus, stopped the C-arms from moving) before re-inserting the ID rings, which would have eliminated the danger. Appellant testified he was not trained and never asked what to do if ID rings fell out of the coil. There is no testimony in the record that appellant was trained to re-insert ID rings in front of a traversing CoilMaster. Appellant never raised safety concerns about the way he was trained to run the CoilMaster. In fact, according to his wife, appellant was very impressed with Precision's attention to safety and the fact they were making sure he was being safe and protected. Finally, appellant testified he was told after his accident that other employees had gotten hit by the C-arms. No names were mentioned.
 {¶ 17} With regard to a prior similar accident on the CoilMaster, Joseph Cox testified *Page 8 
that he was involved in a near miss incident while operating the CoilMaster in 2000. Cox explained that he was prepping a coil by inserting ID rings when the CoilMaster came up behind him as it was moving from one position to the next. One of the C-arms struck Cox in the back and pinned him against "the side wall" of the coil. Cox managed to squeeze away from the coil. He only suffered scrapes and did not need medical treatment. In fact, Cox completed wrapping the coil and then told his supervisor Darren Wolf about the incident. Darren Wolf told Cox he should not have been between the coil and the traversing CoilMaster. Cox also told Joseph Wolf, a general manager at the time, about the incident. Cox was told he was at fault for being where he should not have been and received a verbal warning. Cox returned to the CoilMaster and finished his shift. An accident report for the incident lists Cox's failure to pay attention to his surroundings as an unsafe act that contributed to the incident. Cox testified that although he was not told to do so, he understood he could stop the machine (so that it would not traverse) and then insert the ID rings.
 {¶ 18} The evidence shows that some employees had heard that Cox was involved in a similar incident with the CoilMaster. Of the deposed employees, one did not know anything about a prior similar incident; one knew it involved a coil and a C-arm but had no other details; and two heard about Cox's incident after appellant's accident but did not know the details and circumstances regarding Cox's incident. Swartz was the only employee who had talked to Cox about the incident. Cox told Swartz that he (Cox) was aware the C-arms were coming down on him as he kept putting the ID rings on the coil.
 {¶ 19} With regard to management, Gregory Bergman, a plant manager, was not aware of Cox's incident with the CoilMaster. Darren Wolf did not remember Cox telling him about his incident with the CoilMaster or filling out an accident report. Joseph Wolf did not recall talking to Cox about the incident; only recalled the incident because of recent discussions; and did *Page 9 
discussions; and did not recall the details and circumstances of the incident. Finally, following appellant's accident, a production supervisor heard that something similar had happened to Cox but did not know the details or circumstances of Cox's incident.
 {¶ 20} Jeremy Gillis testified he trained appellant to run the CoilMaster for a day and one half; trained him to insert the ID rings and then start the machine; did not show appellant any manuals or the CoilMaster JSA, but believed Swartz showed them to appellant; and told appellant he could ask any employee in the wrap bay area for help or advice at any time. Gillis denied he trained appellant to re-insert ID rings while the CoilMaster was traversing, and was "positive" he did not train appellant to go back to the machine to re-insert ID rings without first turning the machine off. Gillis also testified that (1) when ID rings would fall off, he would stop the machine and then re-insert the ID rings; (2) he has never seen employees re-insert ID rings while the machine is on; (3) although prior to appellant's accident, employees could stand in front of the CoilMaster while any of its parts were moving, he has never seen employees do that; (4) the safest way to re-insert ID rings is to first turn off the machine; (5) if he were to be near a coil when the CoilMaster is traversing, he would face the CoilMaster so that he could see it coming at him; (6) he believes he told appellant about the "real loud beeping sound" the CoilMaster makes when it is moving; and (7) Precision has no quota regarding the number of coils to be wrapped per hour or shift.
 {¶ 21} Charles "Butch" Swartz, a Precision employee since 1996, testified that he is certified to run the CoilMaster, has run the CoilMaster since it was installed, and helped create the current JSA for the CoilMaster. The record shows that the original JSA for the CoilMaster was dated September 16, 2002, was subsequently revised in 2004 (and dated November 19, 2004), and was again revised in March 2005. Swartz testified that before appellant's accident, the ID rings would be inserted before the CoilMaster (and its C-arms) would come down to the coil to wrap it and that when the ID rings were inserted, the CoilMaster could either be stopped *Page 10 
CoilMaster could either be stopped or running. Swartz also testified that whenever the ID rings would fall off, they would be re-inserted. Swartz testified that he was involved in training appellant on the CoilMaster for about two days, although not on the first day. During his deposition, Swartz was not asked how he trained appellant. Swartz stated that appellant was a quick learner.
 {¶ 22} In an affidavit, Swartz stated that (1) he trained appellant for two days on the CoilMaster; (2) he did not train appellant to start the machine and then insert the ID rings while the machine is traversing; (3) he never saw appellant start the machine and then insert the ID rings while the machine was traversing toward appellant; (4) during the training, he advised appellant not to get in front of the CoilMaster or stand between the coil and the machine while the machine was traversing; and (5) he showed appellant the CoilMaster JSA and told him to read it.
 {¶ 23} Ralph Richardson, a Precision employee since 1995, helped set up the CoilMaster when it was first installed. Although he never trained appellant to run the machine, he trained several employees over the years. Richardson testified that while the training is basically hands-on, the CoilMaster JSA was posted in two different places, including on the CoilMaster; employees are always told to read JSA books and other manuals while they are learning; he personally told the employees he trained on the CoilMaster to read the CoilMaster JSA; and every time a JSA is issued, employees are required to read it and sign off. Before appellant's accident, Richardson had never seen anyone get hurt on the CoilMaster. Richardson further testified that ID rings can be inserted on a coil while a different coil is being wrapped, and that he (1) was never trained to walk in front of the CoilMaster when it is traversing from one position to the next; and (2) does not believe he ever inserted ID rings while the CoilMaster was traversing from one position to the next, or observed anyone perform that way. Richardson stated that whenever the CoilMaster is in a traverse mode, a buzzer *Page 11 
is in a traverse mode, a buzzer sounds to warn people to stay out of the way of the traversing CoilMaster; otherwise, "[i]t would be like standing in front of a tank." Finally, Richardson testified that if an employee needed to get into the traversing area, the machine could be stopped beforehand. In fact, appellant should have stopped the machine before re-inserting the ID rings and should not have walked in front of the CoilMaster as it was traversing from one position to the next.
 {¶ 24} Lynn Spencer, an occasional CoilMaster operator, testified her training on the CoilMaster was hands-on only but that she read the JSA which was posted in the wrap bay area. Spencer was trained to insert the ID rings when the machine was off, and did not remember ID rings falling off when she was running the CoilMaster. Spencer also testified that when the CoilMaster is traversing, a very loud "buzzer" can be heard.
 {¶ 25} Gregory Bergman was the plant manager at the time of appellant's accident. Bergman testified that (1) when he used to run the CoilMaster prior to appellant's accident, he was aware an operator could come in contact with a C-arm, which was why the machine was equipped with safety warnings such as audible alarms when the CoilMaster was traversing; (2) however, he did not think an operator could be caught between a coil and the C-arms; (3) as installed, the CoilMaster was safe to use and was properly guarded if operated correctly; (4) he never trained an employee to re-insert an ID ring while the CoilMaster was traversing; (5) rather, for safety purposes, employees were instructed to disable the machine before getting close to a coil nearby the C-arms; (6) it is easy to stop the machine before re-inserting an ID ring; (6) appellant should not have re-inserted the ID rings while the CoilMaster was traversing; (7) rather, he should have first disabled the machine and shut it off; (8) when appellant went back to the machine to re-insert the ID ring, there would have been an alarm going on and a light flashing warning him not to enter the traversing area; and (8) bonuses or incentives were not based upon the number of wrapped coils. *Page 12 
 {¶ 26} Joseph Wolf was the vice-president of operations at the time of appellant's accident (he is now the president of the company). In an affidavit, Wolf stated that Precision adheres to the following safety policy (which is typically posted in the lobbies and production area):
 {¶ 27} "Precision Strip believes that all accidents are preventable. We are committed to continuous improvements in safety by eliminating the causes of workplace accidents. Working safely is a condition of employment and no job is so important or unimportant that it cannot be done safely. Each associate is responsible for safety. We expect all associates to place safety above expediency or short cuts, while working toward our goal of zero accidents."
 {¶ 28} Wolf also stated that as part of that safety policy, Precision enacted principles regarding individual safety responsibility as follows: "As an associate, your highest priority must be your personal safety and the safety of your fellow associates. You are expected to know and follow all safety rules and procedures, and accept responsibility for your personal safety. * * * Safety is a team effort and we expect each associate to actively participate in all areas of safety. Work activities should be planned to maximize safety and efficiency, and you are encouraged to suggest methods for continuous improvements in safety."
 {¶ 29} Wolf testified that (1) employees are trained not to be close to the CoilMaster or walk or be in the traversing area when the CoilMaster is traversing; (2) he has never seen an employee enter the traversing area while the CoilMaster was traversing; (3) the CoilMaster emits a beeping sound during the traverse mode to warn employees of an upcoming potential hazard; (4) employees are trained to recognize the beeping sound as a warning; (5) if something is moving and has an audible alarm, you do not step in front of it but get out of the way; (6) when the CoilMaster is traversing, there is a pinch point hazard between the coil and the C-arms; (7) however, every pinch point does not necessarily result in an accident; and (8) *Page 13 
and (8) employees are sometimes injured through their own unsafe acts. Wolf further testified that appellant could have safely re-inserted the ID rings had he turned off the machine first so that it was no longer traversing, or had he inserted the ID rings while the machine was in the wrap phase at another position. In fact, that is precisely what employees are trained to do.
 {¶ 30} Construing the foregoing evidence most strongly in favor of appellant, we find that reasonable minds can only come to the conclusion that Precision did not know that by operating the CoilMaster, harm to appellant would be a substantial certainty. While Precision knew there was a pinch point hazard between a coil and the C-arms when the CoilMaster is traversing and that an employee could come in contact with the C-arms, this was only mere knowledge and appreciation of the risk, something short of substantial certainty. See Sanek, 43 Ohio St.3d 169.
 {¶ 31} The evidence shows that although employees were trained to first insert the ID rings and then start the CoilMaster, some employees did not follow this procedure. There is no evidence that either appellant or employees were trained to step in front of the traversing CoilMaster to re-insert ID rings. Joseph Wolf testified he had never seen an employee enter the traversing area while the CoilMaster was traversing. Bergman testified that as installed, the CoilMaster was properly guarded if operated correctly and that employees were instructed to disable the machine before getting close to a coil nearby the C-arms. Both Wolf and Bergman testified that the CoilMaster emitted a loud beeping sound whenever it was traversing to warn employees of an upcoming potential hazard. Appellant testified that on occasions he had inserted ID rings before starting the machine; he could have stopped the CoilMaster before re-inserting the ID rings but did not; and although he knew the CoilMaster was heading his way and he heard it beeping as it was approaching him, appellant never looked to see exactly where the CoilMaster and its C-arms were. *Page 14 
 {¶ 32} "An employer cannot be held to know that a dangerous condition exists and that harm is substantially certain to occur when he has taken measures that would have prevented the injury altogether had they been followed. * * * [W]hen safety devices or rules are available but are ignored by employees, the requisite knowledge of the employer is not established." Vance, 2006-Ohio-7032, ¶ 31.
 {¶ 33} With regard to Cox's prior incident with the CoilMaster, we find that it did not put Precision on notice that an injury such as the one suffered by appellant was substantially certain to occur. We disagree with appellant that Cox's near-miss incident created a genuine issue of fact as to the second prong of the Fyffe test. While Cox's incident and his subsequent report showed that there was a potential pinch point hazard between a coil and the C-arms when the CoilMaster was traversing, it does not justify the conclusion that injury to another employee was substantially certain to occur. Exposure to the risk was not inherent in performing the job since the CoilMaster did not need to traverse for employees to insert or reinsert ID rings.
 {¶ 34} Appellant argues that the testimony of his expert witness, Gerald Rennell, an expert in machine guarding and safety, supports his position that his injury was substantially certain to occur.
 {¶ 35} The 2002 JSA for the CoilMaster in effect at the time of appellant's accident listed being caught between the coil and the C-arms as a potential hazard but did not instruct employees to stay outside of the traversing area when the CoilMaster is traversing. Rennell testified that the language of the JSA was inadequate because it did not explain how to avoid the unguarded pinch point hazard between the coil and the C-arms. Rennell testified it was his opinion that (1) by allowing and/or training employees to be in the traverse area when the CoilMaster was traversing, regardless of why an employee was in the traverse area at that moment, (2) specifically, based upon the way appellant was trained, (3) by failing to properly *Page 15 
warn employees of the pinch point hazard in the traverse area, and (4) because Precision knew that employees should not be in the traverse area, Precision knew that an accident was substantially certain to occur. Rennell also testified that Precision knew appellant was inserting ID rings when the CoilMaster was traversing because Gillis knew it. Rennell further testified that in light of Cox's incident, Precision also knew employees were in the traverse area when the CoilMaster was traversing. Rennell testified that the presence of an alarm and flashing light on the CoilMaster was inadequate because over time training falls apart and employees learn not to pay attention to warnings and make mistakes; the warnings only tell an employee that the machine is moving; the warnings do not tell an employee that the machine is getting close to him and that he should not be there; and warnings cannot be used in lieu of a guard and do not eliminate hazards.
 {¶ 36} Expert testimony can be used to establish the necessary elements in an employer intentional tort case. See Teal v. The ColonialStair Woodwork Co., Fayette App. No. CA2004-03-009, 2004-Ohio-6246. However, simply because an expert concludes that an accident is substantially certain to occur does not necessarily establish that element as a legal conclusion. Vance, 2006-Ohio-7032, ¶ 37. Rather, the opinion "must create a genuine issue of material fact from a legal standpoint." Id. Despite Rennell's opinion to the contrary, the facts of this case do not demonstrate a substantial certainty that the accident would occur. Even if a guard should have been in place so that employees could not enter the traverse area when the CoilMaster was traversing or so that the machine would shut off whenever an employee was in the traverse area, "the failure to provide available safety devices may constitute negligence or recklessness, but does not constitute substantial certainty." Id. Likewise, even if appellant's training and supervision were inadequate, "it would constitute negligence or recklessness at best, and would not rise to the level of substantial certainty." Id. *Page 16 
 {¶ 37} As the Ohio Supreme Court held in Van Fossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, "[t]here are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be qualified as an `intentional' tort[.]" Id. at 117.
 {¶ 38} Appellant also refers to the citation issued against Precision by OSHA following appellant's accident. However, OSHA violations are only one of many factors to be taken into consideration in determining whether harm was substantially certain to occur. See Maddox v. L.O.Warner, Inc. (Feb. 7, 1996), Montgomery App. No. 15468. There is no evidence that prior to appellant's accident, Precision was cited by OSHA regarding the CoilMaster or ordered by OSHA inspectors to provide a guard for the pinch point hazard between the coil and the C-arms. SeeSanek, 43 Ohio St.3d at 172. A relevant OSHA violation does not evidence the requisite intent unless there is an actual pre-accident citation.Ferryman v. Conduit Pipe Prods. Co., Madison App. No. CA2007-02-007,2007-Ohio-6417, ¶ 23, citing Sanek at 172. Precision's actions under the facts of this case simply do not rise to the level of egregiousness so as to constitute an intentional wrong.
 {¶ 39} Finally, appellant cites Duco v. Wheeling-Pittsburgh SteelCorp., Jefferson App. No. 07 JE 41, 2008-Ohio-3092, a case involving wrapping steel coils, although not involving a CoilMaster. In that case, the plaintiff was putting identifying information on a first coil when a second coil, two to three feet away, began rolling and crushed the employee against the first coil. When a coil was set down by a crane, employees were instructed to ensure the coil was stable by waiting only five seconds. Finding there were genuine issues of fact under the first two prongs of the Fyffe test, the Seventh Appellate District reversed the grant of summary *Page 17 
judgment in favor of the employer.
 {¶ 40} Evidence in Duco showed that the plaintiff was trained to step between two coils to wrap one; there was a lack of safety procedures regarding timing, spacing, and coil placement; and the employer knew there was a pinch point hazard created by a coil rolling into another coil. Evidence in Duco also showed that the floor where the coils were set for wrapping was in disrepair (with undulations, holes, and uneven areas); for many years, the plaintiff and another employee had expressed their concerns about rolling coils caused by the floor's flaws; over the years, coils had rolled in part due to the uneven floor, at times causing damage; the employer knew that during the wrapping process, coils rolled for various reasons, including because of the uneven floor; management knew the floor was in disrepair; management knew employees stepped between coils for the wrapping process; and the employer discouraged the use of blocks during the wrapping process. Upon reviewing the facts in Duco, we find that the facts are distinguishable from the case at bar, and that the holding in Duco does not apply here.
 {¶ 41} Weighing the evidence in favor of appellant, we find that reasonable minds could not conclude that Precision knew that the harm that befell appellant was substantially certain to occur. Appellant has, therefore, not met the requirements of the second prong of theFyffe test. Having failed in this regard, appellant's employer intentional tort claim fails as a matter of law and we need not consider his argument related to the first and third prongs of the Fyffe test. See Luce, 2008-Ohio-3591. Likewise, Karen Gibson's derivative consortium claim fails. Appellant's assignment of error is overruled.
 {¶ 42} Judgment affirmed.
WALSH, P.J. and POWELL, J., concur.
[1] Karen Gibson's claims are for consortium. Throughout the opinion, Timothy Gibson will be referred as "appellant' as he is the primary plaintiff. When necessary, Timothy and Karen Gibson will be referred as "the Gibsons."
[2] R.C. 2745.01, effective April 7, 2005, now governs an employer's liability for intentional torts. Because the accident in the case at bar occurred prior to the enactment of the current statute, this case is governed by the standard set forth in Fyffe. *Page 1